**James DAVIS, Plaintiff,**

**v.**

**CITY OF NEW YORK, Defendant.**

**No. 00 CIV. 4309(SAS).**

United States District Court, S.D. New York.

Sept. 23, 2002.

Harry Kresky, New York, NY, for Plaintiff.

James Lemonedes, Donald C. Sullivan, Assistant Corporation Counsel, New York, NY, for Defendant.

*OPINION AND ORDER*

SCHEINDLIN, District Judge.

In the autumn of 1998, then-police officer James Davis's name appeared on the Liberal Party "slate" for the upcoming November election. Over the next few months, Davis conducted a minimal campaign and, on November 3, he was listed on the election ballot as the Liberal Party's nominee for State Assembly. The next day, the New York City Police Department fired Davis for violating a law that prohibits police officers from accepting a political party's nomination without resigning their commission. *See* N.Y. City Charter Ch. 49 § 1129.

Davis explained to the Police Commissioner that he was never the Liberal Party nominee because he had not filed a certificate accepting the nomination. This view was later supported when the Board of Elections stated in a November 10th letter that it erred in including Davis on the ballot because he was not an official nominee. Nonetheless, members of the Police Department refused to reinstate Davis.

Davis eventually brought this action under 42 U.S.C. § 1983 ("section 1983") alleging that the Police Department took these and other adverse actions against him because he had previously engaged in the following activities that are protected by the First Amendment: (1) challenging a Democratic incumbent, Clarence Norman, in a primary election the summer of 1998, (2) criticizing the Police Department for police brutality over the years, and (3) speaking out on issues of public concern (*e.g.,* violence in the media). On June 10, 2002, a jury found that the Police Department had retaliated against Davis for one of these reasons when, after receiving the Board of Elections letter, it did not rein-

state his commission. Davis was awarded $100,000 in damages.

The City of New York[1] now moves to set aside this verdict under Rule 50 of the Federal Rules of Civil Procedure on the ground that the evidence presented at trial does not support the jury's finding that the Police Department has an official policy or custom of retaliating against police officers for exercising their First Amendment rights—an essential element of a section 1983 claim against a municipality. For the reasons explained below, the City's motion is granted.[2]

## I. LEGAL STANDARD

Rule 50 permits a court to override a jury's verdict and enter judgment against a party where "there is no legally sufficient evidentiary basis for a reasonable jury to find for that party on that issue. . . ." Fed.R.Civ.P. 50(a). In making this determination, a court is required to

> consider the evidence in the light most favorable to the party against whom the motion was made and to give that party the benefit of all reasonable inferences that the jury might have drawn in his favor from the evidence. The court cannot assess the weight of conflicting evidence, pass on the credibility of witnesses, or substitute its judgment for that of the jury.

*Tolbert v. Queens Coll.*, 242 F.3d 58, 70 (2d Cir.2001) (quoting *Smith v. Lightning Bolt*

*Prods., Inc.* 861 F.2d 363, 367 (2d Cir.1988) (quotation marks omitted)). "[A]lthough the court should review the record as a whole, it must disregard all evidence favorable to the moving party that the jury is not required to believe." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 151, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000).

A party seeking judgment as a matter of law bears a heavy burden. *See Burke v. Spartanics, Ltd.*, 252 F.3d 131, 136 (2d Cir.2001). Judgment as a matter of law should be granted only if: "(1) there is such a complete absence of evidence supporting the verdict that the jury's findings could only have been the result of sheer surmise and conjecture, or (2) there is such an overwhelming amount of evidence in favor of the movant that reasonable and fair minded [persons] could not arrive at a verdict against [it]." *Galdieri–Ambrosini v. National Realty & Dev. Corp.*, 136 F.3d 276, 289 (2d Cir.1998) (quotation marks omitted, brackets in original). In sum, a court may grant a Rule 50 motion only where "the evidence, viewed in the light most favorable to the opposing party, is insufficient to permit a reasonable juror to find in [his] favor." *Id.*

## II. FACTS

In 1991, New York City hired Davis to work as a Transit police officer.[3] A few

---

1. The City of New York is the only defendant here because the Police Department is one of its agencies and "[a]ll actions and proceedings for the recovery of penalties for the violation of any law shall be brought in the name of the city of New York and not in that of any agency, except where otherwise provided by law." N.Y. City Charter Ch. 17 § 396.

2. Defendant also moves for a new trial under Rule 59 on the ground that erroneous evidentiary rulings at trial were prejudicial to defendant and substantially swayed the outcome.

This motion is denied for the reasons stated on the record when the evidence was originally proffered.

3. Many of the following facts are taken from this Court's earlier Opinion, *Davis v. City of New York*, No. 00 Civ. 4309, 2000 WL 1877045 (S.D.N.Y. Dec.27, 2000). Because this is a motion to set aside the verdict, the facts are presented in the light most favorable to Davis and consistent with the jury's verdict. In this regard, it is important to emphasize that the jury only found in Davis's favor on

year later, Davis transferred to the New York City Police Department where he was eventually assigned to the Police Academy as an instructor. During Davis's career as a police officer, he received various awards and letters of commendation from political and community leaders. Moreover, Davis was never disciplined or sanctioned by the Police Department.

Following the Crown Heights riots in August of 1991, Davis became politically active. He spoke out against police brutality.[4] Davis also made it a goal to try to bring together the Black and Jewish communities in Crown Heights by, for example, organizing an annual "Stop the Violence" march around the anniversary of the unrest in Crown Heights. In subsequent years, Davis was active on other issues of public concern as well. For example, Davis campaigned for "Toys 'R' Us" not to sell "look-alike" toy guns to children. He also threatened to organize a boycott of MTV's advertisers unless MTV removed music videos depicting violent or sexually explicit messages.

In 1997, Davis ran on the Democratic Party "ticket" or "slate" to represent his district on the City Council but he did not resign his commission as a police officer.[5] *See* Trial Transcript ("Tr.") at 47. In doing this, Davis violated the law because the New York City Charter provides in relevant part that:

> Any ... member of the police force ... who shall during his or her term of office be nominated for any office elective by the people ... and shall not, within ten days succeeding same, decline the said nomination, shall be deemed thereby to have resigned his or her commission and to have vacated his or her office ....

N.Y. City Charter Ch. 49 § 1129. Once an individual is designated as a party's nominee that person holds an "office elective by the people." *Id.* Thus, any police officer nominated to run for office on a party's ticket must resign his commission or "decline said nomination."[6] *Id.* Although Davis did neither of these things, the Police Department did not discipline him. In fact, Davis campaigned with the support and encouragement of his superiors. In September 1997, Davis lost his bid for City Council.

In June 1998, Davis challenged Clarence Norman for the Democratic Party's nomination for State Assembly in his district. Relative to Davis, Norman was politically well-connected and powerful—Norman had been the State Assembly incumbent of that district for over a decade and he was Chairperson of the Kings County Democratic Party Organization. Nonetheless, on September 15, 1998, Davis lost the primary election to Norman by a mere 580 votes.[7]

one portion of his claim—*i.e.*, the Police Department began retaliating against Davis after November 24, 1998.

**4.** For example, Davis often told others about how, as a teenager, two white police officers approached him outside his home, put guns to his head and falsely accused him of stealing a car. The officers then slammed his head against the car and falsely arrested him.

**5.** In 1996, Davis had attempted to run for Congress, but his petition was successfully challenged and his name did not appear on the ballot.

**6.** Davis has never challenged the constitutionality of this law and it is not an issue here.

**7.** *See* Jonathan P. Hicks, "Fired From One Job Because He Tried To Seek Another," *N.Y. Times*, Nov. 15, 1998, at A10, attached to Plaintiff's Revised Memorandum of Law in Opposition to Defendant's Motion for Post–Judgment Relief ("Pl.Mem.") at 7.

During the primary campaign, the Police Department launched an investigation into Davis's conduct. An Investigating Officer's Report, Preliminary Investigation from the Internal Affairs Bureau ("IAB") dated September 11, 1998, contains the following allegation:

> Capt. Ogara of the 071 Pct reports that Verona Hollis a restaurant owner alleges that the Subject officer [Davis] while displaying his shield told her to hang his poster in her window. PO Davis is running for State Assembly. Ms. Hollis also alleges that when she told PO Davis she would not display his poster he stated, 'Do you know who I am. You don't know who you are dealing with. I'll close your drug dealing business.'

Plaintiff's Exhibit ("Pl.Ex.") 20; Tr. at 222–25. According to Log Data from the Internal Affairs Division, the matter was ultimately referred to the Personnel Bureau for resolution. *See* Pl.Ex. 16; Tr. at 392–93. Nothing in the record indicates that the Police Department or IAB made any conclusions about Davis's behavior or that the matter was closed.

Although Davis had seriously pursued the Democratic nomination and his name appeared on the primary ballot, he did not resign from the Police Department. This was perfectly legal, however, because a member of the police force only holds "elective office" under the City Charter upon being nominated to run on a particular party's ticket. N.Y. City Charter Ch. 49 § 1129. Police officers may therefore pursue a nomination, as Davis did, by placing their names on the primary ballot or campaigning. Such actions do not run afoul of the law because the officer is not holding an "elective office" but simply seeking it.[8] *Id.*

After Davis lost the Democratic primary to Norman, his name appeared on the Liberal Party's "slate" petition as the Liberal Party nominee for State Assembly.[9] It is undisputed that if Davis had been an actual nominee of the Liberal Party,[10] he would have had to resign his commission as a police officer. Yet, for several reasons, Davis was not a legitimate nominee. The Liberal Party did not file the certificate that is required to nominate a candidate enrolled in another party,[11] the petition supporting Davis's nomination for the Liberal Party did not contain enough signatures, and Davis never filed a required certificate accepting his nomination.

■ Of course, any outsider who was not well-versed in election law—such as a

---

**8.** A second report on Davis's conduct during the primary, which was filed on September 15, 1998, stated:

> It is the opinion of the Office of Legal Matters that Police Office[r] Davis by simply running in the primaries ... has not yet received the nomination of his party. Thus Police Officer Davis is not running for office and has not violated any regulations of this Department. Deborah Zoland [however] has stated that if Police Officer Davis does win the primary on September 15, 1998, thus winning his parties['] nomination, he must then resign from this Department within ten (10) days.

Pl.Ex. 21.

**9.** Davis alleged in his complaint and testified at trial that his name appeared on the Liberal Party slate without his participation or approval.

**10.** According to the Liberal Party's website: "The Liberal Party of New York State is the longest existing third party in the history of the United States. It was founded in 1944 as an alternative to a state Democratic Party dominated by local party machines rife with corruption and a Republican Party controlled by special interests." Official Website of Liberal Party of New York State, http://www.liberalparty.org/.

**11.** At all relevant times, Davis was a member of the Democratic Party.

voter or employees at the Police Department—would not know that Davis was not an actual nominee of a political party. From all appearances, it looked as if Davis had the Liberal Party's nomination and was holding an "elective office." Moreover, while Davis knew he was not the Liberal Party's nominee and could not legitimately win the position for State Assembly, he nonetheless " 'conducted a minimal campaign to show voters where they could find his name on the ballot.' " *Davis*, 2000 WL 1877045 at *1 (quoting Amended Complaint ¶ 32).[12]

According to his testimony at trial, Davis did not conduct this campaign to win the election. *See, e.g.*, Tr. at 58–59. Rather, with his name already on the Liberal Party slate, Davis feared a poor showing of voters would significantly harm his political future.[13] Davis merely wanted people to vote for him so that his political career would not be adversely affected.[14] While conducting this campaign, Davis continued to perform all of his duties as a police officer.

The election for New York State Assembly was held on November 3, 1998. Davis's name appeared on the official ballot and many people voted for him even though he could not have legally served as an Assembly member had he won. The next day, November 4, employees of the Police Department went to Davis's house to confiscate his badge and firearm. Later that day, members of the Police Department, who did not understand the intricacies of the City Charter or New York election law, informed Davis that he had constructively resigned from the Police Department by failing to decline the Liberal Party nomination.

The next day, November 5, Davis attempted to resolve the matter by delivering a letter to then-Police Commissioner Howard Safir in which he explained why he had not officially run on the Liberal Party ticket (*e.g.*, he never filed a required certificate accepting his nomination). Davis tried several more times to resolve the matter with Safir but received no response.[15] On November 10, 1998, the

---

**12.** "A party's assertion of fact in a pleading is a judicial admission by which it normally is bound throughout the course of the proceeding." *Bellefonte Re Ins. Co. v. Argonaut Ins. Co.*, 757 F.2d 523, 528 (2d Cir.1985).

**13.** Davis testified at trial:

So I realized [I was] probably not going to win, it's highly unlikely, if you are a Democratic [sic], most people come out in the general election they vote straight down the Democratic line. But my name is on the booth and now the county leader or the newspapers is going to say I was slaughtered, I was destroyed, you know, no one is going to remember how well I did in the primary. So I tried to call up my people and I said, listen, we got to do some kind of campaign for the purposes of putting my name out there so we better do some good showing. I know the odds are that you are not going to win. You are not going to win against a Democratic [sic] in a general election on the Liberal line. That was my

thinking. So we got out there and tried to muster up as much campaign as possible. We printed up some flyers. If you[r] late, we got out there trying to put some flyers out there telling people to come out and vote for us in November so we can have a decent showing. But if I was going to run earlier, I would have campaigned—I would have [not] stopped campaigning. I stopped campaigning, I thought it was over.

Tr. at 58–59.

**14.** Nothing in the record indicates that Davis informed members of the public, or made it generally known, that this was why he wanted people to vote for him.

**15.** An article submitted by Davis with his memorandum in opposition to the City's Rule 50 motion states:

It is a murky situation. After losing the primary by 580 votes, Mr. Davis told reporters and supporters that he planned to run on the Liberal line.

Board of Elections wrote a letter to Davis stating that it had erroneously placed his name on the election ballot and that Davis had not officially run on the Liberal Party's ticket. Davis's lawyer then forwarded this letter to the Police Department in a letter dated November 24, 1998. *See* Pl. Ex. 1, Tr. at 75; *see also infra* Part IV.A. (quoting relevant portions of the letters by the Board of Elections and Davis's lawyer). On December 7, 1998, the IAB recommended that Davis not be reinstated. *See* Central Personnel Index Background Request, Pl.Ex. 22; Tr. at 116–17. The IAB did not give a reason for this recommendation. *See id.*

During this process, Davis began to lay the groundwork for a lawsuit against the Police Department. On December 3, 1998, Davis filed a complaint with the Equal Employment Opportunity Office of the New York City Police Department. On December 9, 1998, he filed a notice of claim with the Comptroller of the City of New York, which alleged that the Police Department had violated his constitutional rights and wrongfully discharged him.[16] On December 22, 1998, Davis brought an Article 78 proceeding in state court that sought to annul his removal from active police officer status. *See* Tr. at 77.

On January 18, 2000, a year after Davis had begun his state action, Justice Barbara R. Kapnick of the Supreme Court of the State of New York found that Davis had not violated section 1129 and ordered that the Police Department reinstate Davis as a police office forthwith with back pay. *See* Pl.Ex. 33 at 10; Tr. at 79. The Police Department subsequently reinstated Davis as a police officer, awarded him back pay, and assigned him to the 69th precinct where he worked the night shift. *See* Tr. at 81.

On January 27, 2000, Davis purchased an index number in the Clerk's office of the New York State Supreme Court, New York County. On May 25, 2000, Davis served a Summons with Notice on the New York City Police Department. The City then removed the action to this Court. Among other things, Davis's Amended Complaint alleged: (1) his termination and the Department's subsequent actions were in retaliation for his exercise of his First Amendment rights, (2) the City's actions were motivated by racial discrimination, and (3) the City was liable for the intentional infliction of emotional distress and prima facie tort under New York law. On December 27, 2000, this Court granted the City's motion to dismiss all of Davis's claims with the exception of his allegation

---

Despite that announcement, the Liberal Party agrees with Mr. Davis that he was not their candidate. "At no time did the Liberal Party's state executive committee consider Mr. Davis as a candidate," said Martin I. Hassner, the party's executive director. "He was not certified, he was not notified and, thus, did not sign a letter of acceptance."
When asked why Mr. Davis's name had appeared as a Liberal candidate in the 43d Assembly District, Mr. Hassner said: "It must have been a technical glitch."
Hicks, *supra*, N.Y. Times, Nov. 15, 1998, at A10.

**16.** The notice of claim alleged, inter alia, that the violation of constitutional rights and

wrongful discharge committed by the NYPD, as well as the NYPD's failure to reinstate plaintiff, were deliberate, malicious and in retaliation against plaintiff as: (1) a minority police officer who has been active in community affairs, and, in particular, in efforts to bring about constructive dialogue between the Black and Jewish communities in Crown Heights through marches and other efforts; (2) a police officer who breached the "blue wall of silence" by speaking out against acts of brutality against citizens by New York City police officers; and (3) as a citizen who sought nomination to the Assembly almost defeating Clarence Norman in the primary.

that the City had retaliated against him for engaging in certain acts that are protected by the First Amendment. *See Davis*, 2000 WL 1877045 at *1.

After a four-day trial, a jury considered whether the City had retaliated against Davis for exercising his First Amendment right when it: (1) terminated his employment on November 4, 1998, (2) refused to reinstate him after Davis sent a letter to Police Commissioner Safir on November 5, 1998, (3) refused to reinstate him after it received the Board of Elections's statement of error in a letter from Davis's lawyer dated November 24, 1998, and (4) assigned him to the night shift of the 69th precinct, rather than the Police Academy, after being ordered by a court to reinstate Davis.

The jury was instructed that Davis had a First Amendment right to run in the 1998 Democratic primary campaign, criticize the Police Department, and speak out on issues of public concern. The jury was also instructed that Davis did not have a First Amendment right to violate New York City Charter § 1129 by running on the Liberal Party ticket in the 1998 general election without resigning his commission as a police officer.[17] After being so instructed, the jury found that the Police Department's decision to fire Davis on November 4, 1998, was not motivated by his protected First Amendment activities. *See* Special Verdict Form ("SVF"), Ex. A to the Declaration of Donald C. Sullivan, Assistant Corporation Counsel, in Support of Defendant's Motion for Relief Under

Rules 50 and 59, at 1. The jury also found the Police Department legitimately refused to reinstate Davis after it received his letter dated November 5, 1998. *See id.* Likewise, the jury found that it was appropriate for the Police Department to assign Davis to the night shift at the 69th precinct when it reinstated his commission in 2000. *See id.*

However, the jury also found that the Police Department retaliated against Davis by not reinstating his commission after it received the letter from the Board of Elections from Davis's lawyer that explained that Davis had not officially run on the Liberal Party ticket.[18] Thus, according to the jury's finding, the Police Department's decision not to rehire Davis after receiving this letter was motivated by: (1) his 1998 campaign against Norman in the Democratic primary, (2) Davis's criticism of the Police Department, (3) his comments on issues of public concern or (4) some combination thereof. *See id.* At the same time, the jury also found that none of these protected activities motivated the Police Department's decision to terminate his employment on November 4, 1998, and not reinstate him after receiving Davis's letter.

The jury then found that this act of retaliation was taken because there exists an official policy or custom in the Police Department of retaliating against people who exercise their First Amendment rights. The City argues that Davis failed to present sufficient evidence to support this finding. This issue is the focus of this Opinion.

---

**17.** Davis did not object to this instruction.

**18.** Throughout the trial, the City defended its decision not to reinstate Davis by claiming that it had the right to refuse his reinstatement until a New York State Supreme Court justice determined whether Davis was, in fact, nominated by the Liberal Party in the 1998 General Election. *See* Memorandum of Law

in Support of Defendant's Motion For Relief Under Rules 50 and 59 ("Def.Mem.") at 11. Because the jury found that the Police Department's refusal to reinstate Davis after receiving the Board of Elections letter was in retaliation for the exercise of his First Amendment rights, the City's argument was found to be pretextual. *See* Question 1.C. of the SVF.

### III. SECTION 1983 AND MUNICIPAL-ITIES

#### A. *Monell* Liability

■ Davis sued the City of New York pursuant to section 1983 on the ground that one of its agencies, the Police Department, violated his First Amendment right to free speech. Section 1983 states in relevant part:

*Every person* ... of any State or Territory ... [who] subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress ...

42 U.S.C. § 1983 (emphasis added). While in *Monroe v. Pape,* 365 U.S. 167, 81 S.Ct. 473, 5 L.Ed.2d 492 (1961), the Supreme Court held that local governments and their agencies (such as the Police Department) do not qualify as "persons" under section 1983, the Court overruled this decision less than two decades later in *Monell v. New York City Dep't of Soc. Servs.,* 436 U.S. 658, 663, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). In overruling *Monroe,* the Supreme Court made it clear that it was not interpreting the statute so as to impose unbridled liability on municipalities. Quite the opposite: "[T]he language of § 1983, read against the background of the [ ] legislative history, compels the conclusion that Congress did not intend municipalities to be held liable *unless* action pursuant to *official municipal policy* of some nature *caused* a constitutional tort." *Id.* at 691, 98 S.Ct. 2018 (emphasis added). As subsequently reaffirmed and explained by the Supreme Court, municipalities such as the City of New York may only be held liable when the city *itself* deprives an individual of a constitutional right. Thus, in order

for an individual deprived of a constitutional right to have recourse against a municipality under section 1983, she must show that she was harmed by a municipal "policy" or "custom." *Monell,* 436 U.S. at 690–91, 98 S.Ct. 2018. *See also Board of County Comm'rs v. Brown,* 520 U.S. 397, 403–04, 117 S.Ct. 1382, 137 L.Ed.2d 626 (1997); *Pembaur v. City of Cincinnati,* 475 U.S. 469, 479–81, 106 S.Ct. 1292, 89 L.Ed.2d 452 (1986).

■ A municipality may not be held vicariously liable under section 1983 on the basis of its employer-employee relationship with the employee because "a municipality may not be held liable on a theory of respondeat superior." *Jeffes v. Barnes,* 208 F.3d 49, 56 (2d Cir.2000). *See also Monell,* 436 U.S. at 691, 98 S.Ct. 2018. Moreover, "courts must apply 'rigorous standards of culpability and causation ... to ensure that' the indirect-causation theory not result in the municipality's being 'held liable solely for the actions of its employee.'" *Jeffes,* 208 F.3d at 61 (2d Cir.2000) (quoting *Brown,* 520 U.S. at 405, 117 S.Ct. 1382). Thus, a custom or policy cannot be shown by pointing to a single instance of unconstitutional conduct by a mere employee of the state. *See Oklahoma City v. Tuttle,* 471 U.S. 808, 831, 105 S.Ct. 2427, 85 L.Ed.2d 791 (1985) (Brennan, J., concurring in part and concurring in the judgment) (stating that "[t]o infer the existence of a city policy from the isolated misconduct of a single, low-level officer, and then to hold the city liable on the basis of that policy, would amount to permitting precisely the theory of strict *respondeat superior* liability rejected in *Monell* ").

■ In determining municipal liability, it is necessary to conduct a separate inquiry into whether there exists a "policy" or "custom." The Supreme Court has identi-

fied at least two situations that constitute a municipal policy: (1) where there is an officially promulgated policy as that term is generally understood (*i.e.*, a formal act by the municipality's governing body), *see Monell*, 436 U.S. at 690, 98 S.Ct. 2018, and (2) where a single act is taken by a municipal employee who, as a matter of state law, has final policymaking authority in the area in which the action was taken, *see Pembaur*, 475 U.S. at 480–81, 106 S.Ct. 1292.[19]

▇▇▇ A municipal "custom," on the other hand, need not receive formal approval by the appropriate decision-maker—"an act performed pursuant to a 'custom' that has not been formally approved by an appropriate decisionmaker may fairly subject a municipality to liability on the theory that the relevant practice is so widespread as to have the force of law." *Brown*, 520 U.S. at 404, 117 S.Ct. 1382; *see also Tuttle*, 471 U.S. at 823–24, 105 S.Ct. 2427. To succeed on this theory, plaintiff must prove the existence of a practice that is permanent. *See Praprotnik*, 485 U.S. at 127, 108 S.Ct. 915. "[O]ne method of showing custom is to demonstrate that the custom or practice is so well settled and widespread that the policymaking officials of the municipality can be said to have either actual or constructive knowledge of it yet did nothing to end the practice." *Silva v. Worden*, 130 F.3d 26, 31 (1st Cir.1997) (quotation marks and citation omitted).

When either a "policy" or "custom" has been proven, section 1983 imposes liability because the City in its capacity as a municipality—as opposed to mere employees of the City—harmed the plaintiff for exercising a constitutionally protected right. *See,*

*e.g., Brown*, 520 U.S. at 417, 117 S.Ct. 1382 ("The 'official policy' requirement was intended to distinguish acts of the *municipality* from acts of *employees* of the municipality, and thereby make clear that municipal liability is limited to action for which the municipality is actually responsible.") (quoting *Pembaur*, 475 U.S. at 479–80, 106 S.Ct. 1292) (emphasis in original); *Pembaur*, 475 U.S. at 480, 106 S.Ct. 1292 ("*Monell* reasoned that recovery from a municipality is limited to acts that are, properly speaking, acts 'of the municipality'—that is, acts which the municipality has officially sanctioned or ordered.").

**B. The Charge and Verdict Sheet**

With regard to municipal liability, the jury was charged as follows:

> Plaintiff must establish an official policy in one of two ways:

> The first way is to show by a preponderance of the evidence that a policymaker either took the action or should have known that the actions were [sic] taken by subordinate personnel were wrong full [sic].

> The second way is to show by a preponderance of the evidence that the conduct complained of was caused by a custom or policy that existed in the New York City Police Department at the relevant time.

Tr. at 687–88.

 * * * * * *

> [P]laintiff may prevail if he shows by a preponderance of the evidence that while Mr. Safir's subordinates took the action, Mr. Safir acquiesced in their conduct because he knew or should have

---

**19.** *See also Walton v. Safir*, 122 F.Supp.2d 466, 477 (S.D.N.Y.2001) (stating that "the act of an official with final decision-making authority, if it wrongfully causes the plaintiff's constitutional injury, may be treated as the official act of the municipality") (citing *City of St. Louis v. Praprotnik*, 485 U.S. 112, 123, 108 S.Ct. 915, 99 L.Ed.2d 107 (1988)).

known that his subordinates were acting in a deliberate and retaliatory manner. To find for plaintiff on this theory, you must conclude that the actions of the subordinate employees must be manifestly retaliatory, that is, it must be so clearly retaliatory that you can fairly conclude that Mr. Safir must, or at least should have known, that his subordinates were retaliating against Mr. Davis.

Now the second one.

In the alternative, you may find for plaintiff at this stage if you decide that he has proven, by a preponderance of the evidences [sic], that the complained of conduct was the result of [an] official policy of the municipality, even though this policy has not received formal approval through the city's official decision-making channels, for example, it's not written or published.

Such liability cannot be predicated on isolated or sporadic incidents. It must be founded upon practices of sufficient duration, frequency and consistency that the conduct has become a traditional methods of carrying out policy.

The City of New York is liable on an official policy theory if you are convinced that the acts in question were officially sanctioned, although it [sic] has not received formal approval.

In order to find for the plaintiff, you must find a practice within the police department of retaliating against officers for exercising their right to free speech. The practices must be so flagrant that it convinces you that the Commissioner himself acquiesced in this practice.

Tr. at 688–90.

As explained above, the jury found that Davis had been retaliated against for exercising certain First Amendment rights once the Police Department received the Board of Elections letter explaining that it erred in listing Davis as the Liberal Party nominee. *See* SVF at 2. That is, the decision not to rehire Davis after November 24, 1998, was motivated by: (1) Davis's 1998 campaign against Norman in the Democratic primary, (2) his criticism of the Police Department, (3) his comments on issues of public concern or (4) some combination thereof.

The jury also answered the following questions with regard to municipal liability:

2. *As To The Issue of Municipal Liability*

A. Did Mr. Davis prove, by a preponderance of the evidence, that then-Police Commissioner Howard Safir took the complained of actions against Mr. Davis in order to retaliate against him for exercising his First Amendment rights?

No.

B. Did Mr. Davis prove, by a preponderance of the evidence, that then-Police Commissioner Howard Safir acquiesced in the complained of conduct because he knew or should have known that his subordinates were acting in a deliberate and retaliatory manner towards Mr. Davis for exercising his First Amendment rights?

Yes.

C. Did Mr. Davis prove, by a preponderance of the evidence, that the Police Department has an "official policy," even if this policy has not received formal approval, of retaliating against individuals for exercising their First Amendment rights?

Yes.

*Id.* at 2–3.

## IV. DISCUSSION

The question presented on this Rule 50 motion is whether Davis presented any evidence that reasonably supports a finding that the Police Department has a "policy" or "custom" of retaliation against individuals for challenging incumbent Norman in the Democratic primary, criticizing the Police Department, speaking out on issues of public concern or some combination thereof.[20] *See supra* Part III.A.

### A. The Evidence Does Not Support a Finding that a Policy of Retaliation Exists

■ Because the Police Department did not have an officially *promulgated* policy that required officers to be fired for challenging Norman, criticizing the Police Department or speaking out on issues of public concern, the only way that Davis could prove there was a "policy" of retaliation was by showing that then-Police Commission Safir (the Police Department's final policymaking authority) either retaliated against Davis or ratified the decision of his subordinates to do the same. The jury found against Davis with respect to the former: Safir did not, in fact, take any of the complained of actions against Davis. *See* SVF at 3. With only the latter avenue available to prove that there was a policy of retaliation, the jury found in Davis's favor: "Safir acquiesced in the complained of conduct because he knew or should have known that his subordinates were acting in a deliberate and retaliatory manner towards Mr. Davis for exercising his First Amendment rights." *Id.*

Marshaling the evidence in the light most favorable to Davis, there are four groups of evidence that bear on what Safir knew or should have known. *First,* there are several letters from various people dis-

---

20. The City has also argued that the evidence does not even support the jury's verdict that these Police Department employees refused to rehire Davis because of: (1) his 1998 campaign against Norman in the Democratic primary, (2) his criticism of the Police Department or (3) his comments on issues of public concern. With respect to Davis's criticism of the Police Department and speaking out on issues of public concern, the City argues that it is significant that Davis had been engaged in these activities for years but had never received anything but praise from his peers and supervisors. Likewise, Davis had run for office in 1996 and 1997, but no employee ever took adverse action against him (even when he violated the City Charter) prior November 24, 1998. In fact, the evidence in the record shows that the first time that Davis received any adverse attention from the Police Department was when the IAB opened an investigation during the 1998 Democratic primary after a restaurant owner alleged that Davis threatened to use his power as a police officer to shut down her business unless she hung his poster in her window. *See* Pl.Ex. 20; Tr. at 222–25.

Indeed, Davis did not introduce *any evidence* that would explain why these employees began to retaliate against him on November 24, 1998. Moreover, Davis failed to call any of these employees as witnesses during the trial. They were not questioned about their reasons for refusing to reinstate him or subjected to cross-examination. Yet, as the Supreme Court has stated in a different context when discussing how to weigh an individual's state of mind: "It is *only* when the witnesses are present and subject to cross-examination that their credibility and the weight to be given their testimony can be appraised." *Poller v. Columbia Broad. Sys.,* 368 U.S. 464, 473, 82 S.Ct. 486, 7 L.Ed.2d 458 (1962) (emphasis added). Because Davis did not call these employees, the jury was forced to engage in pure speculation as to their motives for refusing to fire him.

While these arguments may have a great deal of merit, it is unnecessary to address them because even assuming that the jury's answer with respect to Question 1.C. of the SVF is supported by the evidence (a doubtful proposition), the verdict cannot stand for the reasons set forth in Part IV.A.-B., *infra.*

cussing Davis's situation. In a letter dated November 4, 1998, Davis wrote to Safir explaining that he did not violate section 1129 of the City Charter as he was never nominated to represent the Liberal Party in the 1998 General Election. *See* Pl.Ex. 37, Tr. at 72. In a follow-up letter dated November 24, 1998, Harry Kresky, Davis's attorney, wrote to Safir:

Officer Davis wrote to you on November 4, 1998 explaining the circumstances, pointing out the total lack of authority for this action, and demanding that his termination be immediately rescinded. . . . Therefore, Officer Davis could not have violated Section 1129 of the City Charter which mandates that any police officer who is nominated for public office and does not decline shall be deemed to have resigned from the Police Department. A copy of Mr. Voyticky's letter is enclosed.

Pl.Ex. 1, Tr. at 75. In that letter, Kresky enclosed a letter from Francis J. Voyticky, Deputy Chief Clerk of the Board of Elections, which states: "You are correct in stating that your name never should have appeared on the ballot for the November 3rd, 1998 General Election. The printing of your name as such candidate was solely due to error on the part of the Board of Elections as the papers purporting to nominate you was [sic] in fact null and void." Pl.Ex. 35; Tr. at 75. Finally, there is the letter sent to Davis from George A. Grasso, Deputy Commissioner of Legal Matter, on December 17, 1998, which states:

This letter is in response to your letter of November 4, 1998 in which you requested that your "termination be immediately rescinded." We have reviewed

this matter with the New York City Law Department. Please be advised that it is the position of the City of New York that your status as a police officer was vacated by operation of law under City Charter § 1129. The Law Department has advised that it would be inappropriate for the Police Commissioner to reinstate you to your position at this time.

Pl.Ex. 30; Tr. at 76.

*Second,* there is a report of Detective Cathy Chapman dealing with Davis's allegations of race discrimination that is relevant as to what Safir knew or should have known about his subordinates' actions. *See* Pl.Ex. 17; Tr. at 118–19. In her report, which also exonerates Safir of any race discrimination, Detective Chapman summarizes the reinstatement process relating to Davis as follows:

An inquiry with [the] Employee Management Division revealed that a letter was sent by PO Davis concerning his termination from the New York City Police Department which was forwarded via the Chief of Personnel on November 11, 1998 to the Employment Section. The Department initiated a process of reinstatement shortly after Davis' request. It should be noted that a Central Personnel Index check made by the Employment Section on December 8, 1998 revealed Internal Affairs Bureau's recommendation that Davis not be reinstated to the Department (No reason noted).[21]

Pl.Ex. 17 (referring to Central Personnel Index Background Request, Pl.Ex. 22; Tr.

---

**21.** According to Arnold S. Wechsler, Director of the Employee Management Division, the reinstatement process stopped when the IAB made its recommendation. *See* Tr. at 313. Wechsler explained that the reasons why IAB might put a flag on a particular request for reinstatement include "[a]n open internal affairs investigation, a closed internal affairs investigation with a finding of guilt, a poor performance, poor record on the officer's part, [or a] poor sick record." *Id.* at 320.

at 116–17). Safir approved this report on May 4, 1999. *See* Pl.Ex. 17

*Third,* although Davis chose not to call Safir as a witness at trial,[22] a deposition of Safir taken during discovery was read into the record. In that deposition, Safir was questioned as to when he first knew about Davis leaving the police force. Safir replied that he knew of Davis's departure at the time it was taking place as "the documents relative to it came across my desk." Tr. at 376.

*Fourth,* and finally, Davis relies on a defense exhibit, a New York Times article written eleven days after he was fired, as evidence of Safir's actual or constructive knowledge of retaliation. *See* Pl. Mem. at 7; *see also* note 6, *supra* (citing article). After discussing the circumstances surrounding Davis's deemed resignation, the November 15th article concludes with "Mr. Safir said he would take another look at the situation." Def. Ex. F, Ex. B to Declaration of Harry Kresky.

## 1. The Evidence Does Not Show Safir Knew About the Retaliation Against Davis

Nothing in the above-described evidence indicates that Safir *knew* his subordinates were refusing to rehire Davis because he had run again Norman in the primary, criticized the Police Department, spoke out on issues of public concern, or some combination thereof. Even drawing all inferences in favor of Davis, the evidence only shows that Safir knew: (1) members of the Police Department fired Davis and then refused to reinstate him on the stated grounds that the city's lawyers had con-

cluded Davis had violated the law, (2) the IAB put a hold on his reinstatement for an unstated reason, and (3) Davis, his lawyer, and the Board of Elections believed that Davis had not been a nominee of the Liberal Party and should therefore not have been deemed resigned.

█ In *Praprotnik,* 485 U.S. at 127, 108 S.Ct. 915, a plurality of the Supreme Court made it clear that to hold a municipality liable for the acts of its employees, a plaintiff cannot just prove that the final policymaking authority (*i.e.,* Safir) knew of the adverse action (*i.e.,* refusing to reinstate Davis).[23] The plaintiff must also prove that the final policymaking authority knew that the subordinates took that action for unconstitutional reasons. "If the authorized policymakers approve a subordinate's decision *and the basis for it,* their ratification would be chargeable to the municipality because their decision is final." *Id.* (emphasis added).

At trial, Davis failed to present any evidence indicating that Safir knew that his subordinates were refusing to rehire Davis because they did not like the fact that Davis had run against Norman in the primary, criticized the Police Department, spoken on issues of public concern or some combination thereof. Yet, "[s]imply going along with discretionary decisions made by one's subordinates ... is not a delegation to them of the authority *to make policy.* It is equally consistent with a presumption that the subordinates are faithfully attempting to comply with the policies that are supposed to guide them." *Praprotnik,* 485 U.S. at 130, 108 S.Ct. 915 (emphasis added). In light of *Praprotnik's* explicit

---

**22.** Davis had listed Safir as a potential trial witness.

**23.** *See also City of Canton v. Harris,* 489 U.S. 378, 387, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989) ("Nor, *without more,* would a city au-

tomatically be liable under § 1983 if one of its employees happened to apply the policy in an unconstitutional manner, for liability would then rest on *respondeat superior.*") (emphasis added).

language, as well as the numerous circuits that have followed it,[24] the City cannot be held liable on the ground that Safir only knew that his subordinates were refusing to reinstate Davis.

## 2. The Evidence Does Not Show Safir Was Deliberately Indifferent

Nor does this evidence support a finding that Safir should have known his subordinates were retaliating against Davis on the ground that his subordinates' behavior was "manifestly retaliatory."[25] Tr. at 688. No reasonable person could say that, based on this evidence, Safir was showing "reckless disregard for or deliberate indif-

ference to" that fact that his subordinates had decided not to reinstate Davis because Davis had run against Norman in the primary election, criticized the Police Department or spoke out on issues of public concern. *Rogers v. City of Little Rock*, 152 F.3d 790, (8th Cir.1998) (quotation marks and citation omitted).[26] Safir did not "turn a blind eye for fear of what [he] might see." *Jones v. City of Chicago*, 856 F.2d 985, 992 (7th Cir.1988) (Posner, J.). Indeed, this Court would be hard pressed to hold that Safir could be deemed negligent. Yet, even a supervisor's negligence is not sufficient grounds on which to find a municipality liable under section 1983.[27]

**24.** *See Matthews v. Columbia County* 294 F.3d 1294, 1297 (11th Cir.2002) ("The final policymaker, however, must ratify not only the decision itself, but also the unconstitutional basis for it.") (citing *Gattis v. Brice*, 136 F.3d 724, 727 (11th Cir.1998)); *Beattie v. Madison County Sch. Dist.*, 254 F.3d 595, 603 (5th Cir.2001) (holding that plaintiff "must impute" a subordinate's "allegedly improper motives" to the final policymaker "by demonstrating that the board approved both [subordinate's] decision and the basis for it"); *Christie v. Iopa*, 176 F.3d 1231, 1239 (9th Cir.1999) ("To show ratification, a plaintiff must prove that the 'authorized policymakers approve[d] a subordinate's decision and the basis for it.' Accordingly, *ratification requires*, among other things, *knowledge of the alleged constitutional violation*.") (quoting *Praprotnik*, 485 U.S. at 127, 108 S.Ct. 915) (citations omitted) (emphasis added); *Gillette v. Delmore*, 979 F.2d 1342, 1347 (9th Cir. 1992) ("*Praprotnik* requires that a policymaker approve a subordinate's decision *and the basis for it* before the policymaker will be deemed to have ratified the subordinate's discretionary decision.") (emphasis in original) (citing *Bouman v. Block*, 940 F.2d 1211, 1231 (9th Cir.1991)); *Fiorenzo v. Nolan*, 965 F.2d 348, 351 (7th Cir.1992) (holding that the district court properly granted summary judgement in favor of the municipality because plaintiff failed to present evidence that the final policymaker "participated in the alleged constitutional wrongdoing"); *Andrews v. City of Philadelphia*, 895 F.2d 1469, 1481 (3rd Cir.1990) (quoting *Praprotnik* and emphasiz-

ing that the final policymaker must ratify the basis for the subordinate's decision).

**25.** *See Praprotnik*, 485 U.S. at 130, 108 S.Ct. 915 ("It would also be a different matter if a series of decisions by a subordinate official *manifested* a 'custom or usage' of which the supervisor must have been aware. In [that case], the supervisor could realistically be deemed to have adopted a policy that happened to have been formulated or initiated by a lower-ranking official.") (emphasis added).

**26.** *See also City of Canton*, 489 U.S. at 388, 109 S.Ct. 1197 (holding that "inadequacy of police training may serve *as* the basis for § 1983 liability *only* where the failure to train amounts to *deliberate indifference* to the rights of persons with whom the police come into contact.") (emphasis added).

**27.** *See Lanigan v. Village of East Hazel Crest*, 110 F.3d 467, 477 (7th Cir.1997) ("'[G]ross negligence is also not enough to impose supervisory liability [under *Monell*]. Rather, supervisors must ... act either *knowingly* or *with deliberate, reckless indifference*.") (quotation marks and citation omitted) (emphasis in original); *Gonzalez v. Ysleta Indep. Sch. Dist.*, 996 F.2d 745, 761–62 (5th Cir.1992) ("Decisions that authorize, tolerate, or condone, like those *reflecting deliberate indifference*, are made with knowledge of the objectionable conduct; they all preclude a finding of liability on the basis of negligence ... ") (gathering numerous citations); *Langley v. Adams Coun-*

Davis attempts to prove that Safir should have known about his subordinates's conduct by placing a great deal of weight on a New York Times article that states: "Mr. Safir said he would take another look at the situation." *See* Pl. Mem. at 7 (quoting article cited in note 6, *supra*). Even putting to one side whether this is an accurate paraphrase of what Safir actually said,[28] the article fails to show that the behavior of his subordinates was "manifestly retaliatory" for two reasons. The first, and most obvious, reason is that nothing in the article accuses the Police Department of refusing to rehire Davis because he engaged in protected First Amendment speech. According to the article, Davis was only "insist[ing] that although he was on the ballot on the Liberal line, he never received an official notice that he had been designated the party's candidate." Hicks, *supra, N.Y. Times,* Nov. 15, 1998, at A10. Indeed, it appears that the first time that Davis accused the Police Department of refusing to reinstate him for a reason other than the fact that it mistakenly believed he had been the Liberal Party nominee was when Davis filed a complaint with the Equal Employment Opportunity Office on December 3, 1998.

▮▮ The second reason to disregard the article is that even had Safir kept his purported promise to look into Davis's situation,[29] this would not demonstrate that he would have discovered and then ignored his subordinate's real reasons for not reinstating Davis. Indeed, on November 15th—the day the article was published—Safir's subordinates were *not* refusing to rehire Davis because of his First Amendment activities. The jury found as a fact that the subordinates did not start retaliating against Davis until after November 24, 1998, when Davis's lawyer forwarded the . Board of Elections letter to the Police Department. Thus, no amount of investigation would have revealed that Safir's subordinates were acting for unconstitutional reasons until at least nine days after the article was published.[30]

In conclusion, it is worth remembering, if not emphasizing, that the New York City Police Commissioner is head of the largest police department in the United States. Davis and the police officers who decided to retaliate against him were only a handful of over 35,000 uniformed officers employed by the New York City Police Department.[31] On any given day, one of

---

ty, 987 F.2d 1473, 1481 (10th Cir.1993) ("Liability of supervisor under § 1983 must be predicated on supervisor's deliberate indifference rather than mere negligence.").

**28.** At trial Davis testified that portions of the article were "inaccurate." Tr. at 180 (Davis stating: "Newspaper articles at many times are inaccurate."). Davis's reason for doubting the veracity of the article is plain—the article also states: "After losing the primary by 580 votes, Mr. Davis told reporters and supporters that he planned to run on the Liberal line." Hicks, *supra, N.Y. Times,* Nov. 15, 1998, at A10.

**29.** In the alternative, Davis may be arguing that Safir broke his promise and did not look into the situation and, thus, the City must be held liable. "But the mere failure to investigate the basis of a subordinate's discretionary

decisions does not amount to a delegation of policymaking authority, especially where (as here) the wrongfulness of the subordinate's decision arises from a retaliatory motive or other unstated rationale." *Praprotnik,* 485 U.S. at 130, 108 S.Ct. 915.

**30.** Even had Safir heard of Davis's accusation that police officers were retaliating against him at some point after November 24, 1998, he would have had a good reason to disregard it since it was also accompanied by accusations that Safir was discriminating against Davis on the basis of his race. Detective Chapman found that this latter accusation had no merit. *See* Pl.Ex. 17; Tr. at 118–19.

**31.** The New York City Police Department currently has over 38,000 employees: 25,191 Officers; 6,909 Detectives; 5,339 Sergeants;

these employees may take action against a fellow officer or citizen for illegitimate reasons and there are a number of laws that prohibit such behavior.

But liability under section 1983—the law under which Davis brought this action—is not triggered simply because an employee violated the Constitution. Rather, the plaintiff must also show that the Police Department was the cause of this violation. In this light, if one considers the demands that are made on the New York City Police Commissioner's time over the course of an average day and the evidence presented at trial, it is obvious that no one could reasonably say that Safir was *deliberately* indifferent to Davis's situation. *See* notes 22–24, *supra* (citing cases providing the standard for holding a municipality liable under section 1983).

## B. The Evidence Does Not Support a Finding that a Custom of Retaliation Exists

 In a section 1983 lawsuit, a municipality may also be held liable for the unconstitutional conduct of its employees if they acted according to a practice so permanent and well-settled that it may be deemed a "custom" of the agency. *See supra* Part III.A. Here, Davis introduced witness testimony and two judicial decisions to support his claim that a custom of retaliation was the "moving force" behind the Police Department's decision not to rehire him after receiving the Board of

Elections letter. *Monell,* 436 U.S. at 694, 98 S.Ct. 2018.

*First,* Davis called two witnesses to testify about the Police Department's behavior toward them and their organizations: Eric Adams, a police lieutenant and head of 100 Blacks in Law Enforcement Who Care; and Anthony Miranda, a police sergeant and president of the Latino Officers Association. Adams testified that his organization and its leaders had criticized the Police Department in the past.[32] *See* Tr. at 473–74. Adams also described a lawsuit brought by his organization against the Police Department for alleged surveillance over a two-year period of time. *See id.* at 476. Adams learned that he was under surveillance and that the IAB was investigating his organization when the Chief of IAB testified in a different case. *See id.* at 480–81. Adams also testified that the Police Department monitored his organization's meetings.[33] On cross-examination, however, Adams conceded that it was the City's position that he and his organization were under surveillance because another officer had filed a complaint of harassment against them. *See id.* at 488–89.

Miranda testified that the Police Department has also engaged in surveillance of his organization and its members. *See id.* at 501. According to Miranda, police officers were posted in front of meeting locations, license plates were written down,

---

1,723 Lieutenants; and 467 Captains. *See New York, N.Y. Police Department Employees Count* available at www.policepay.net/nyccount.pdf (data collected by consulting group specializing in analyzing police compensation).

**32.** "[W]e made several public statements that were very critical [of] the manner in which the Police Department was policing, particularly the communities of color, the black and Hispanic community." Tr. at 473–74.

**33.** *See id.* at 482–83 ("There are individuals in nondescript cars, meaning unmarked vehicles, writing down the license plates of the membership who attend our meetings."); *see also id.* at 496 ("[T]here have been press conferences when we thought we were talking to members of the press and later find out that the person was actually a member of the deputy commissioner of public information office.").

and press conferences were tape recorded. *See id.* at 502–03. According to Miranda, such surveillance inhibited his organization's members from speaking out publicly. *See id.* at 505. When the Court questioned Miranda as to how he knew that the surveillance had the effect of chilling free speech, he replied: "Because I had conversations with members who would not speak out publicly, but would tell us privately information." *Id.* The Latino Officers Association also brought suit against the Police Department based on the alleged surveillance of its members. *See id.* at 508.

*Second,* Davis offered two cases into evidence, which were described in the following manner:

> In one case, a federal court in this District found that a New York City police officer who was on "dismissal probation for insubordination" on a completely unrelated matter had been terminated from the force in violation of her constitutional rights in retaliation for speaking out about the actions of the Department's Street Crimes Unit.
>
> Second case, the federal court in this District issued an injunction against NYPD on the grounds that a policy violated the First Amendment of the U.S. Constitution and the policy concerned police officers who seek to testify or otherwise speak before public agencies and private organizations on departmental policy or positions on public matters. Latino Officers Association v. Safir, you don't need the docket number, and so on. This applies to officers who seek to

engage in such speech in their private capacities. This policy required, before it was struck, the officer to provide five days' notice to his superiors prior to addressing the public agency or private organization about such matters and further required the officer to give a summary of his statement after the event. The policy does not apply to officers when they spoke to the press in their nonofficial capacity about nonconfidential matters. The Court found that there was no evidence of this policy actually being enforced.

Tr. at 470.

Even drawing all reasonable inferences in favor of Davis, this evidence does not reasonably support a finding that the Police Department has a custom of retaliating against police officers for either criticizing it or speaking out on issues of public concern.[34] The testimony of Adams and Miranda fails to support a finding of a custom of retaliation for the simple reason that neither officer alleged that the police actually *retaliated* against them (*i.e.,* took an adverse action). Indeed, the only action taken against these organizations was part of an investigation that began when a police officer filed a complaint of harassment against them. *See id.* at 488–89.

Of course, the witnesses testified that they were the objects of surveillance. But surveillance of First Amendment activities is not retaliation for those activities. Nor does the fact that surveillance may chill free speech demonstrate that the Police Department, in fact, ever takes adverse action against an employee for criticizing

---

**34.** The jury also might have found that Davis was not reinstated because he had opposed Norman in the primary. But, based on the evidence in the record, the jury had no basis to find that there is a "custom" in the Police Department of retaliating against people who challenge Norman. In fact, if the Police Department took this adverse action because Davis challenged Norman in the primary that

would be the only example of such conduct presented at trial and a "single incident" is not sufficient to prove a custom. *See Tuttle,* 471 U.S. at 823–24, 105 S.Ct. 2427 ("Proof of a single incident of unconstitutional activity is not sufficient to impose liability under Monell, *unless* proof of the incident *includes* proof that it was caused by an existing, unconstitutional municipal policy.") (emphasis added).

the police force or speaking on issues of public concern. In sum, neither the testimony of Adams nor Miranda bears on the issue of whether there was a custom of retaliation that, in turn, caused employees of the Police Department to retaliate against Davis by refusing to rehire him.

Davis also introduced two cases into evidence, but one of them, *Latino Officers*, is irrelevant as to whether there is a custom of retaliation. *Latino Officers* is unavailing because it describes an officially *promulgated* policy (as opposed to a custom) that was stuck down as a prior restraint on speech. Moreover, there is no indication that any police officers were retaliated against for failing to comply with its requirements. This case offered no support for Davis's claim that there was a widespread custom of retaliating against outspoken police officers.

Finally, there is a case of a Police Department employee who was terminated from the police force "for speaking out about the actions of the Department's Street Crimes Unit." *Id.* at 470. This employment action, undoubtedly unconstitutional, is relevant on the issue of whether the Police Department has a custom of retaliating against officers who criticize it. Thus, the verdict that the Police Department has a widespread or well-settled custom of retaliating against employees who criticize it boils down to two facts: (1) the jury found that employees of the Police Department refused to reinstate Davis for retaliatory reasons after receiving the Board of Elections letter and (2) a district court found that a different Police Department employee was terminated for criticizing the Street Crimes Unit.

■ This evidence does not support the jury's verdict that employees refused to reinstate Davis on November 24, 1998, pursuant to a custom of retaliation for the simple reason that *two incidents* of unconstitutional conduct by low-level employees in a city agency with over 35,000 employees can never provide a reasonable basis for finding a *widespread* or *well-settled* custom.[35] Widespread means that acts of retaliation are common or prevalent throughout the agency; well-settled means that the acts of retaliation have achieved permanent, or close to permanent, status.[36] Showing that over the course of many years less than 1/100 of 1% of the employees at the largest Police Department in the United States have been retaliated against for engaging in activities protected by the First Amendment can never serve as the basis for a finding that there is a widespread or well-settled custom of retaliation in the agency.[37]

---

**35.** As a matter of law, one incident of unconstitutional conduct by a city employee cannot be a basis for finding an agency-wide custom. *See Tuttle*, 471 U.S. at 823–24, 105 S.Ct. 2427.

**36.** As the Supreme Court explained in *Monell*, Congress imposed liability on municipalities under section 1983 "because of the persistent and *widespread* discriminatory practices of state officials . . . . Although *not authorized by* written law, such practices of state officials could well be so permanent and *well settled* as to constitute a 'custom or usage' with the force of law." 436 U.S. at 691, 98 S.Ct. 2018 (quotation marks and citation omitted) (emphasis added).

**37.** In addition, the facts of the stipulation and the facts of Davis's case appear to be wholly unrelated. The adverse employment action in both cases was taken based on protected First Amendment activities. However, in the former, that protected activity was the employee's outspoken criticism of the Street Crimes Unit. Here, given the evidence of how the Department tolerated Davis's public criticism of the Department over the course of seven years, it appears that the protected activity that motivated the employees to retaliate against Davis was the fact that he ran for public office. The facts of theses cases are so distinct from each other as to make a finding of a custom of retaliation even more unlikely. While the employees at the Police Department may have refused to reinstate Davis for un-

## V. CONCLUSION

The only reasonable version of what happened to Davis that is consistent with the jury's verdict and record as a whole is the following. On November 4, 1998, employees of the Police Department fired Davis for legitimate reasons. These reasons continued to motivate their decision not to reinstate Davis even as he protested that he had not violated the law. Upon receiving the letter from the Board of Elections, these employees knew that Davis was wrongly terminated. However, the employees then took it upon themselves not to reinstate Davis. The employees made this decision because they disliked the fact that Davis had run in the recent Democratic primary, criticized the Police Department or spoke out on issues of public concern.[38]

In taking this action, these employees of the Police Department violated the Constitution because Davis had a First Amendment right to engage in all of these activities. But Davis cannot prevail on his section 1983 claim against the City of New York by merely showing that employees violated his constitutional rights. Davis was also required to present evidence that these Police Department employees committed their unconstitutional act because of a "policy" or "custom" of retaliation in the agency.

At trial, the plaintiff failed to present sufficient evidence to support a finding that the New York City Police Department had a policy or custom of retaliating against its officers for engaging in First Amendment activities. Accordingly, the jury's verdict is set aside and judgment is entered in defendant's favor. The Clerk of the Court is directed to prepare a Judgment and close this case.[39]

SO ORDERED.

---

constitutional reasons, *but see supra* note 20, these reasons appear to be unique to Davis. Fact-specific cases do not make a "custom" of retaliation.

38. *But see supra* note 20.

39. On June 18, 2002, Davis's lawyer filed a motion requesting an award of attorney's fees in the amount of $37,887.50, expenses in the amount of $1,788.02 and fees for law student research in the amount of $1,575.00. This Court issued an order granting that motion on June 28, 2002. *See* 6/28/02 Order ("Under section 1988, 'the court, in its discretion, may allow the prevailing party [in a suit brought under 42 U.S.C. § 1983], other than the United States, a reasonable attorney's fee as part of the costs ....' Because such an award would not be unjust under the circumstances, plaintiff's motion is granted.") (quoting 42

U.S.C. § 1988(b)); *see also DiFilippo v. Morizio,* 759 F.2d 231, 234 (2d Cir.1985) (holding that there is "a presumption that *successful* civil rights litigants should recover reasonable attorney's fees unless special circumstances render such an award unjust.") (emphasis added). Because the City's motion to set aside the verdict has been granted, Davis is not a "prevailing party." 42 U.S.C. § 1988(b). Thus, the Court's Order of June 28, 2002, is hereby vacated, and Davis's motion for attorney's fees is denied.

In addition, after the parties submitted their briefs in response to the City's Rule 50 motion, Davis's lawyer filed another motion requesting an award for the costs dedicated to briefing that issue. This motion for additional attorney's fees is now denied as moot and the Clerk of the Court is ordered to close that motion.