**Shirley Ann FISK, Plaintiff,**

v.

**David LETTERMAN, Worldwide Pants, Sumner M. Redstone, Leslie Moonves, Mel Karmazin, Viacom Inc., CBS Inc., City of New York, William Delace, Michael Z. McIntee, Project Help, Dr. John Doe, John Joe, Officer J. Soe, Dr. Koe, Dr. Ricardo Castaneda, Dr. Steven Ciric, Dr. William Roman, Susan Kolcun, Delsa Best, Grace Mones, State of Connecticut, Does 1–30, Defendants.**

No. 04 Civ. 6972(VM).

United States District Court,
S.D. New York.

July 17, 2007.

Order Denying Reconsideration
Aug. 14, 2007.

Shirley Ann Fisk, Mojave, CA, pro se.

Janice Casey Silverberg, New York City Law Depart. Office of the Corporation Counsel, New York, NY, for City of New York, Dr. Ricardo Castaneda, Dr. Steven Ciric, William Roman.

Diane K. Kanca, McDonough Marcus Cohn Tretter Heller & Kanca, LLP, New Rochelle, NY, for Project H.E.L.P.

Jamila Ayana Berridge, Epstein, Becker & Green, P.C. (New York), New York, NY, Michele N. Beier, Attorney General, New York, NY, for Susan Colson.

Jonathan Nicholas Francis, Arnold & Porter, LLP, New York, NY, for Delsa Best.

### DECISION AND ORDER

MARRERO, District Judge.

## I. BACKGROUND

Plaintiff Shirley Ann Fisk ("Fisk") brought this action pursuant to 42 U.S.C. § 1983 alleging unlawful search and seizure, denial of due process, infringement of freedom of speech, and other constitutional violations and common law claims. Fisk's complaint arises from her involuntary commitment at Bellevue Hospital ("Bellevue") for psychiatric evaluation and treatment in July 2002. The remaining defendants in the case—Ricardo Castaneda, Steven Ciric, William Roman, Project HELP and the City of New York (collectively, "Defendants")—have moved for summary judgment pursuant to Federal Rule of Civil Procedure 56.[1]

By Order dated June 6, 2007, Magistrate Judge James C. Francis, to whom this matter had been referred for pretrial supervision, issued a Report and Recommendation (the "Report"), a copy of which is attached and incorporated herein, recommending that the Court grant Defendants' motions. The Report further recommended that the complaint be dismissed against all other named and unnamed defendants pursuant to Fed.R.Civ.P. 4(m) for failure to effect service. Fisk filed timely objections to the Report challenging its findings and conclusions. (See Objection of Plaintiff Pro Se, Shirley Ann Fisk, to the Report and Recommendation of the Magistrate, dated June 30, 2007 ("Pl.'s Objection")). For the reasons stated below, the Court adopts the recommendations of the Report in their entirety.

## II. STANDARD OF REVIEW

 A district court evaluating a Magistrate Judge's report may adopt those portions of the report to which no "specific, written objection" is made, as long as the factual and legal bases supporting the findings and conclusions set forth in those sections are not clearly erroneous. See Fed.R.Civ.P. 72(b); Thomas v. Arn, 474 U.S. 140, 149, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985); Greene v. WCI Holdings Corp., 956 F.Supp. 509, 513 (S.D.N.Y. 1997). "Where a party makes a 'specific written objection ... after being served with a copy of the [magistrate judge's] recommended disposition,' however, the district court is required to make a de novo determination regarding those parts of the report." Cespedes v. Coughlin, 956 F.Supp. 454, 463 (S.D.N.Y.1997) (citing United States v. Raddatz, 447 U.S. 667, 676, 100 S.Ct. 2406, 65 L.Ed.2d 424 (1980)). The Court is not required to review any portion of a Magistrate Judge's report that is not the subject of an objection. See Thomas, 474 U.S. at 149, 106 S.Ct. 466. A district judge may accept, reject, or modify, in whole or in part, the findings and recommendations of the Magistrate Judge. See DeLuca v. Lord, 858 F.Supp. 1330, 1345 (S.D.N.Y.1994); Walker v. Hood, 679 F.Supp. 372, 374 (S.D.N.Y.1988).

## III. DISCUSSION

Fisk's objections to the Report consist of a lengthy recitation of her version of the facts stated in generalizations, conjectures, and conclusory terms, essentially the same deficiencies noted in the Report with regard to Fisk's response to Defendants' motions for summary judgment that form a fundamental ground supporting the recom-

---

1. Fisk's claims against various other defendants were dismissed on motions for summary judgment. See Fisk v. Letterman, 424 F.Supp.2d 670 (S.D.N.Y.2006); Fisk v. Letterman, 401 F.Supp.2d 362 (S.D.N.Y.2005).

mendation of dismissal of the complaint. For example, rather than presenting competent psychiatric evidence supporting her claim that her involuntary commitment and medication at Bellevue lacked professional basis in accepted medical standards, Fisk asserts that she "believes and alleges" that Dr. Anne Stockton, the Project HELP psychiatrist who authorized Fisk's transportation to Bellevue, "was paid or otherwise compensated by CBS for her cooperation" in ordering Fisk's involuntary seizure. (Pl.'s Objection at 7). With similar speculation and lack of foundation, Fisk states that she "believes" that Dr. Heather Lewerenz, who examined Fisk at Bellevue and approved her involuntary commitment, "was contacted by [defendant] Grace Mones and urged to change her opinion about Plaintiff." (*Id.* at 16). And she attributes her confinement at Bellevue to the "lies" of the CBS security guard who reported her unusual conduct to the authorities, and to the "unprofessional, unethical behavior" of the doctors and other officials responsible for her involuntary commitment. (*Id.*); *see Gottlieb v. County of Orange*, 84 F.3d 511, 518 (2d Cir.1996) (stating that a party opposing summary judgment cannot defeat a motion by relying on allegations in the complaint, conjecture or surmise, conclusory statements, or mere assertions that the evidence supporting the motion is not credible).

Having conducted a review of the full factual record in this litigation, including, the pleadings, and the parties' respective papers submitted in connection with the underlying motion and in this proceeding, as well as the Report and applicable legal authorities, the Court concludes that the

findings, reasoning, and legal support for the recommendations made in Report are warranted. Accordingly, for substantially the reasons set forth in the Report the Court adopts the Report's recommendations in their entirety.

## IV. *ORDER*

For the reasons discussed above, it is hereby

**ORDERED** that the Report and Recommendation of Magistrate Judge James C. Francis dated June 6, 2007 (Docket No. 144) is adopted in its entirety, and the motions of defendants Ricardo Castaneda, Steven Ciric, William Roman, Project HELP, and the City of New York for summary judgment (Docket Nos. 119 and 126) are GRANTED.

The Clerk of Court is directed to close this case.

**SO ORDERED.**

## REPORT AND RECOMMENDATION

FRANCIS, United States Magistrate Judge.

The plaintiff, Shirley Ann Fisk, brings this action under 42 U.S.C. § 1983, alleging various constitutional violations arising from her involuntary psychiatric commitment at Bellevue Hospital ("Bellevue") in 2002. She has also filed pendent state law claims. Defendants Dr. Ricardo Castaneda, Dr. Steven Ciric, Dr. William Roman, and the City of New York (collectively, the "City defendants") have moved for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure. Defendant Project Help–EA[1] has also moved for summary judgment.[2] For the reasons set

---

1. Ms. Fisk was evaluated and transported to Bellevue against her wishes by Project Help, a program run by the New York City Health and Hospitals Corporation. For reasons set forth in detail below, the entity now moving for summary judgment is a different entity

also known as Project Help, which is run by the Educational Alliance. I will refer to the latter organization as Project Help–EA.

2. All claims against defendants Delsa Best, David Letterman, Leslie Moonves, Mel Kar-

forth below, I recommend that the motions be granted.

*Background*

### A. Legal Background

#### 1. Involuntary Commitment

New York's Mental Hygiene Law permits a Director of Community Services to transport a person to a hospital for involuntary admission if the Director finds that the person "has a mental illness for which immediate inpatient care and treatment ... is appropriate and which is likely to result in serious harm to himself or herself or others." N.Y. Mental Hygiene Law ("MHL") § 9.37(a), (d). Upon arrival at the hospital, a staff physician must confirm the need for involuntary hospitalization before the patient may be admitted. MHL § 9.37(a). "Such patient may not be involuntarily retained beyond seventy-two hours unless an additional staff physician certifies the need for retention." *Project Release v. Prevost*, 722 F.2d 960, 967 (2d Cir.1983) (citing MHL § 9.37(a)).

The patient must be given a statement of her status and her rights at the time of admission, and the mental hygiene legal service must be notified. MHL § 9.39(a). Upon request, a hearing must be held within five days of the patient's admission to determine whether there is reasonable cause to believe that the patient meets the criteria set forth above. MHL § 9.39(a). Even if a judge finds that the patient was properly admitted against her will, the patient cannot be committed on an emergency basis under § 9.39 for more than 15 days. MHL § 9.39(a).

■ A patient may be required to remain in the hospital for more than fifteen days only if two examining physicians certify that the patient continues to be in need of involuntary care. MHL §§ 9.27(a), 9.39(b). "In need of involuntary care" means (1) that the patient has a mental illness for which care and treatment as a patient in a hospital is essential to her welfare and (2) that the patient's judgment is so impaired that she is unable to understand the need for such care and treatment. MHL § 9.01. Consistent with the requirements of due process, although it is not expressly required by statute, the examining physicians must further certify that the patient poses a "real and present threat of substantial harm to herself or others." *Matter of Stefano*, 140 Misc.2d 801, 803–05, 531 N.Y.S.2d 212, 214–15 (N.Y.Sup.Ct.1988).

"An individual admitted [pursuant to medical certification] may be retained without court authorization for up to sixty days." *Project Release*, 722 F.2d at 967 (citing MHL § 9.33). At any time prior to the expiration of those sixty days, an involuntarily committed person may request a hearing "on the question of need for involuntary care and treatment." MHL § 9.31(a). The hearing must be held within five days of receipt of the patient's request. MHL § 9.31(c). At the hearing, the court must "hear testimony and examine the person alleged to be mentally ill, if it be deemed advisable in or out of court." MHL § 9.31(c). If the court determines that the patient is "not mentally ill or not in need of retention," the court must order her released. MHL § 9.31(c).

The Second Circuit has held that the Mental Hygiene Law provisions governing involuntary admission "meet the minimum facial requirements of due process—both substantive and procedural." *Project Release*, 722 F.2d at 971.

mazin, William DeLace, Michael McIntee, Sumner Redstone, Viacom Inc., CBS Broadcasting Inc., Susan Kolcun, Grace Mones, and the State of Connecticut have previously been

dismissed. *See Fisk v. Letterman*, 424 F.Supp.2d 670 (S.D.N.Y.2006); *Fisk v. Letterman*, 401 F.Supp.2d 362 (S.D.N.Y.2005).

## 2. *Involuntary Medication*

Before an involuntarily admitted patient may be given antipsychotic medication without her consent, the "head of the service" must review her objection. 14 N.Y.Codes, Rules & Regs. ("NYCRR") § 27.8(c). If the head of the service determines that the patient should be medicated, the patient may appeal that decision to the director of the hospital. 14 NYCRR § 27.8(c). The patient is entitled to representation on appeal. 14 NYCRR § 27.8(d). If the facility where the patient is being held is operated by the Department of Mental Hygiene, the patient may appeal the director's decision to the Commissioner of the Department. 14 NYCRR § 27.8(e) (3).

██ Following exhaustion of these administrative review procedures, the patient is entitled to *de novo* judicial review of her objection. *Rivers v. Katz*, 67 N.Y.2d 485, 497, 504 N.Y.S.2d 74, 81, 495 N.E.2d 337 (1986). The patient may therefore request a hearing, at which she is entitled to representation by counsel. *Id.* At the hearing, the State bears the burden "of demonstrating by clear and convincing evidence the patient's incapacity to make a treatment decision." *Id.* The State must also demonstrate by clear and convincing evidence that "the proposed treatment is narrowly tailored to give substantive effect to the patient's liberty interest, taking into consideration all relevant circumstances, including the patient's best interests, the benefits to be gained from the treatment, the adverse side effects associated with the treatment and any less intrusive alternative treatments." *Id.* at 497–98, 504 N.Y.S.2d at 81, 495 N.E.2d 337.

## B. *Plaintiff's Involuntary Commitment at Bellevue*

Ms. Fisk has a "romantic attachment" to David Letterman, host of "The Late Show with David Letterman" on CBS, and has described him as "the love of her life." (Declaration of Shirley Ann Fisk in Response to NYC Defendants' Motion for Summary Judgment dated Jan. 15, 2007 ("Fisk Decl.") at 8; Medical Records, attached as Exh. A to Declaration of Media Oliver dated Oct. 27, 2006, Bates No. 0056). In the years immediately prior to her involuntary commitment at Bellevue, she sent e-mails to an online publication for fans of Mr. Letterman every day that she was able to access the Internet, and sometimes sent more than one per day. (Fisk Decl. at 8; Deposition of Shirley Ann Fisk dated Feb. 9, 2006 ("Fisk Dep."), attached as Exh. A to Declaration of Janice Casey Silverberg dated Nov. 30, 2006 ("Silverberg Decl."), at 28–29). She also sent numerous cards, letters, and résumés seeking a position as his personal assistant, and often attempted to call him. (Project Help Report, attached as Exh. A to Stockton Decl., Bates No. 0202; Objections and Answers of Non–Party William DeLace to Deposition Upon Written Questions Submitted by Plaintiff Shirley Ann Fisk ("DeLace Dep."), attached as Exh. F to Silverberg Decl., ¶¶ 20, 44, 46).

In 2000, the plaintiff moved to New York City. (Fisk Dep. at 22). According to CBS security staff, she frequented the Hello Deli, which is adjacent to the theater where the Late Show is filmed, waited outside the theater for hours on end, and sometimes attempted to enter the theater. (DeLace Dep., ¶¶ 15, 20, 22). The plaintiff disputes this account, stating that she "did not 'frequent' the CBS television studios ... but attended a total of three tapings of David Letterman's shows over the course of three years." (Fisk Decl. at 9). She states that she regularly passed by the theater on her way to the public library and the unemployment office, but never attempted to enter the theater "except with a ticket in hand." (Amended Com-

plaint ("Am.Compl."), ¶ 55(a); Fisk Decl. at 11).

Ms. Fisk had several encounters with William DeLace, a CBS security guard. (Fisk Decl. at 8; DeLace Dep., ¶¶ 15, 23). Ms. Fisk maintains that Mr. DeLace assaulted her in the lobby of the theater on February 21, 2004, and again in the Hello Deli on June 4, 2002, at which point she threatened him with a lawsuit. (Fisk Decl. at 8–9, 11; Complaint Report, attached as Exh. OO to Fisk Decl.; Incident Information Slip, attached as Exh. NN to Fisk Decl.). Mr. DeLace admits that he confronted Ms. Fisk in the Hello Deli, but denies that he ever assaulted her. (DeLace Dep., ¶¶ 15, 18, 40–42).

In late June or early July 2002, according to Mr. DeLace, Ms. Fisk's "personality changed and she began to act very strange." (DeLace Dep., ¶ 23). Mr. DeLace contacted the New York City Police Department to ask about getting a restraining order, reporting that the plaintiff "was hanging around outside the building all the time." (DeLace Dep., ¶ 34). Mr. DeLace also contacted the Department of Homeless Services ("DHS"). (Declaration of Dr. Anne Stockton dated Oct. 13, 2006 ("Stockton Decl."), ¶¶ 11–13). Ms. Fisk alleges that these reports to the police and DHS were false and were motivated by Mr. DeLace's "determination to prevent [the] plaintiff from suing him and/or CBS for harassment and assault as [she] had threatened to do ... earlier." (Fisk Decl. at 12, 15).

After speaking to Mr. DeLace, DHS contacted Project Help, a psychiatric outreach program operated by the New York City Health and Hospitals Corporation.[3] (Stockton Decl., ¶¶ 2, 5, 11; Project Help Report, Bates No. 0217). On July 9, 2002, a Project Help team evaluated the plaintiff at the Lenox Hill Neighborhood Association Women's Shelter, where she resided at the time. (Fisk Dep. at 25; Fisk Decl. at 15–16; Project Help Report, Bates Nos. 0215, 0237). At that time, Ms. Fisk stated that "she would like to talk to David Letterman" but denied harassing him. (Project Help Report, Bates No. 0216). She suggested that she was a victim of mis-identification, likely as a result of identity theft. (Project Help Report, Bates No. 0216). Project Help staff reported that the plaintiff "may well be delusional" but that their evaluation did not provide a sufficient basis for involuntary commitment. (Project Help Report, Bates No. 0216; Stockton Decl., ¶ 12).

Two days later, CBS security staff again called DHS to report that Ms. Fisk was exhibiting "increasingly agitated and belligerent behavior," and DHS in turn contacted Project Help. (Stockton Decl., ¶ 11). Dr. Anne Stockton[4] reviewed the July 9 evaluation and went to the CBS studios to speak with William DeLace. (Stockton Decl., ¶¶ 12–13, 16; Project Help Report, Bates No. 0202). Mr. DeLace told her that Ms. Fisk "was becoming increasingly threatening in her behavior to [CBS security staff] ... and seemed more confused over the past few days," and that she had attempted to enter the theater "in disguise." (Stockton Decl., ¶ 13; Project Help Report, Bates Nos. 0202–0203). Mr. DeLace reported that Ms. Fisk seemed "significantly more aggressive and verbally

---

3. Project Help receives reports from social workers and homeless shelter staff regarding persons who may pose a danger to themselves or to others, and "goes into the community to evaluate persons unwilling to come in to a psychiatric emergency room for a psychiatric evaluation." (Stockton Decl., ¶ 6).

4. Dr. Stockton, who works for Project Help, appears to be the person named in the complaint as Dr. Koe. Dr. Stockton is a Director of Community Services under MHL § 9.37. (Stockton Decl., ¶ 4).

angrier," although she had not physically assaulted anyone, and that CBS security had felt the need to call the police regarding her behavior. (Project Help Report, Bates No. 0238).

Dr. Stockton also reviewed a number of e-mails exchanged by CBS staff regarding Ms. Fisk. (Stockton Decl., ¶ 14). One e-mail, dated July 8, 2002, states, "[W]e're concerned now because she has actually gotten 'into the faces'" of the security guards. (Project Help Report, Bates No. 0229). Others, sent in June 2002, state that CBS security had been aware of Ms. Fisk "long term" and that she had recently become "somewhat aggressive with a security guard." (Project Help Report, Bates No. 0235). Dr. Stockton also reviewed e-mails that Ms. Fisk sent in May 2002 to Charles Grodin, an actor, asking him to help her arrange a meeting with Mr. Letterman. (Project Help Report, Bates Nos. 0229–0235, 0238).

Dr. Stockton and the Project Help team went directly from the CBS studios to the Lenox Hill shelter, where they encountered Ms. notes describe her conversation with Ms. Fisk as follows:

> [P]atient repeatedly states that we "have the wrong person—this is a case of mistaken identity." Initially in interview says she has been at CBS studios and that the security "scream at acuse me [sic] of things and grabbed my arm." Later however, she denies that she has ever been there, denies ever writing to D. Letterman or Charles Grodin, and insists that Project Help has "the wrong information." She refuses to discuss David Letterman at all repeatedly saying "I'm calling my attorney." She refuses to even give date of birth and is extremely guarded during all aspects of the evaluation. She is unable to give any explanation for the reports of her recent, angry, agitated behavior at CBS

as reported by their security, and becomes mute.

(Project Help Report, Bates No. 0238).

Dr. Stockton ordered that the plaintiff be transported to Bellevue against her will in the Project Help van for a more thorough psychiatric evaluation. (Stockton Decl., ¶ 19; Project Help Report, Bates Nos, 0196–0200; Fisk Decl. at 13–14). There the plaintiff was evaluated by a resident, Dr. Bensimhon,[5] who found her guarded and uncommunicative and noted that her "story has been inconsistent from one interview to the next." (Medical Records, Bates No. 0016). Ms. Fisk again stated that this was "a case of mistaken identity." (Medical Records, Bates No. 0016). Dr. Bensimhon found that Ms. Fisk's preoccupation with David Letterman, stalking behavior, homelessness, unemployment, and lack of social supports were likely the result of untreated mental illness and that she posed a threat to herself or others. (Medical Records, Bates No. 0022). He indicated the need to rule out delusional disorder, erotomania, and paranoid schizophrenia. (Medical Records, Bates No. 0022).

The next morning, the plaintiff spoke "at length" with Dr. Heather Lewerenz, an attending psychiatrist. (Medical Records, Bates No. 0043). Dr. Lewerenz noted "numerous inconsistencies" in Ms. Fisk's statements. For example, Ms. Fisk told her "she never had a problem with CBS security, then later revealed that they refused to allow her into a taping of the Letterman Show in February." (Medical Records, Bates No. 0043). Dr. Lewerenz diagnosed delusional disorder and recommended involuntary admission to the hospital. (Medical Records, Bates No. 0043).

On July 12, 2002, Dr. Bensimhon and Dr. Lewerenz signed involuntary emergen-

---

**5.** The record does not reveal Dr. Bensimhon's first name.

cy admission forms pursuant to MHL § 9.39 indicating that the plaintiff suffered from delusional disorder and psychosis and was likely to harm herself or others. (Medical Records, Bates Nos. 0194–0195). Ms. Fisk was given a notice of her right to appeal the decision, but refused to sign it. (Medical Records, Bates No. 0209; Fisk Decl. at 21).

After Ms. Fisk was admitted to the psychiatric unit, Dr. William Roman, an attending psychiatrist, was responsible for her treatment. (Deposition Responses of Dr. William Roman dated June 21, 2006 ("Roman Dep."), attached as Exh. B to Silverberg Decl., at 2). After reviewing the Project Help and emergency room records, Dr. Roman determined that the plaintiff suffered from a psychotic disorder. (Roman Dep. at 2–3). A hearing was held at Bellevue on July 16, 2002 to determine whether Ms. Fisk was in need of involuntary hospitalization,[6] and New York State Supreme Court Justice William P. McCooe denied release. (Transcript of Hearing held before Justice William P. McCooe on July 16, 2004 ("7/16/02 Tr."), attached as Exh. H to Silverberg Decl., at 16; Medical Records, Bates Nos. 0213–0214).

After the hearing, Dr. Roman spoke with Mr. DeLace, who said that CBS security had noticed Ms. Fisk

> approaching the studio more frequently, and that one such episode led to some sort of confrontation with a[ ] police officer. When security would approach Ms. Fisk and ask her to leave or not try to enter the building, he said she was increasingly aggressive and belligerent, and it was getting harder to get her to leave.

(Roman Dep. at 3; DeLace Dep. at 6). Dr. Roman also reviewed the e-mails that Dr. Stockton had received from CBS and spoke with Mr. DeLace's supervisor, Stanley Romaine, who confirmed Mr. DeLace's account. (Roman Dep. at 3; Medical Records, Bates No. 0053).

While in the hospital, Ms. Fisk refused to take Risperdal, an anti-psychotic medication. (Medical Records, Bates Nos. 0050, 0053, 0056, 0058). Dr. Ricardo Castaneda, the Director of Psychiatry at Bellevue, brought a petition seeking a court order allowing hospital staff to medicate the plaintiff over her objections. (Roman Dep. at 3–4; Order to Show Cause, attached as Exh. G to Silverberg Decl.). In support of the petition, Dr. Castaneda presented affirmations from Dr. Roman as well as Dr. Steven Ciric, who had interviewed the plaintiff in the presence of her attorney for the purpose of giving a second opinion regarding the need to medicate her over her objections.[7] (Affirmation of Dr. William Roman dated July 19, 2002 ("Roman Aff."), attached as Exh. G to Silverberg Decl.; Affirmation of Dr. Steven Ciric dated July 18, 2002 ("Ciric Aff."), attached as Exh. G to Silverberg Decl.; Deposition Responses of Dr. Steven Ciric dated June 20, 2006, attached as Exh. D to Silverberg Decl., at 2–3). After a hearing on July 24, 2002, Justice William Davis granted the petition. (Transcript of Hearing held before Justice William Davis on July 24, 2002 ("7/24/02 Tr."), attached as Exh. I to Silverberg Decl.; Medical Records, Bates Nos. 0188–0190). Ms. Fisk then took the Risperdal voluntarily because she "did not want to be injected against her will." (Fisk Decl. at 22).

---

**6.** Ms. Fisk was represented by Susan Kolcun of Mental Hygiene Legal Services at each of the hearings held while she was at Bellevue. Ms. Fisk testified on her own behalf at each of these hearings.

**7.** According to Ms. Fisk, this interview was "cursory at best." (Fisk Decl. at 22).

Ms. Fisk remained guarded with hospital staff and continued to insist that she was a victim of identity theft, that someone was impersonating her, and that CBS security had her mixed up with someone else. (Medical Records, Bates Nos. 0052–0053). According to the staff, Ms. Fisk showed "no insight into [her] inappropriate behavior" and did not recognize any need for psychiatric treatment. (Medical Records, Bates No. 0061). On July 29, 2002, Ms. Fisk was involuntarily admitted on a non-emergency basis pursuant to MHL § 9.27 based upon the certifications of Dr. Roman, Dr. Richard Freeman, and Dr. Martin Geller. (Medical Records, Bates Nos. 0182–0184). A hearing was held the following day at Ms. Fisk's request, and Justice Martin Schoenfeld held that the hospital could detain her until September 10, 2002. (Medical Records, Bates Nos. 0180–0181).

Approximately one week after Ms. Fisk began taking Risperdal, Dr. Roman began working with her to formulate a discharge plan, concerned that "a return to the shelter with no structure in place [would be] a certain return to the same potentially dangerous behavior." (Medical Records, Bates No. 0063, 0066, 0146–0147; Roman Dep. at 4). On August 12, 2002, he reported that she "continue[d] to lack insight." (Medical Records, Bates No. 0070). On August 20, 2002, another hearing was held, and Justice William P. McCooe denied Ms. Fisk's request to be released. (Medical Records, Bates No. 0179; Transcript of Hearing held before Justice William P. McCooe on Aug. 20, 2002, attached as Exh. K to Silverberg Decl.). Ms. Fisk was discharged on August 23, 2002; her discharge plan stated that she was to stay at the Queen of Peace shelter in Manhattan. (Medical Records, Bates Nos. 0006–0012). At the time of her discharge, Dr. Roman noted that she had "conceded that it was more trouble than it was worth for her to continue visiting CBS studios, and [ ]

agreed to stop doing that." (Medical Records, Bates No. 0006).

## C. Project Help–EA

Project Help, which initially transported Ms. Fisk to Bellevue, is a program run by the New York City Health and Hospitals Corporation. (Stockton Decl., ¶ 2). It is named as a defendant but was never served with process. Instead, Ms. Fisk served Project Help–EA, an unaffiliated organization. (Revised Affidavit of Diane K. Kanca dated Jan. 18, 2007 ("Kanca Aff."), ¶¶ 1,5; Letter of Janice Casey Silverberg dated Sept. 16, 2005, attached as Exh. C to Kanca Aff.). Project Help–EA is an outpatient drug and alcohol abuse treatment program run by the Educational Alliance. (Affidavit of Jennifer Crumpley dated Jan. 10, 2007 ("Crumpley Aff."), ¶ 2). There is no evidence that Ms. Fisk ever had any contact with Project Help–EA. As is explained in more detail below, the Educational Alliance also runs a homeless outreach program called Project ORE, which runs a drop-in center that Ms. Fisk sometimes frequented. (Crumpley Aff., ¶ 4; Letter of Shirley Ann Fisk dated Dec. 17, 2006 ("Fisk 12/17/06 Letter") at 1). On September 22, 2005, I instructed Ms. Fisk to serve Project Help by October 31, 2005 and to submit a stipulation that Project Help–EA was served in error if that was in fact the case. (Memorandum Endorsement dated Sept. 22, 2005).

Ms. Fisk agreed to stipulate that Project Help–EA had been served in error once the proper entity had been served with process. (Letter of Diane K. Kanca dated Nov. 29, 2006 ("Kanca 11/29/06 Letter"), attached as Exh. D to Kanca Aff., at 1). However, as of October 2006, the plaintiff maintained that she had been unable to locate or serve Project Help. (Kanca 11/29/06 Letter at 2). On November 30, 2006, I ordered Ms. Fisk to inform the

Court of any reasons why Project Help–EA should not be dismissed from the case. (Memorandum Endorsement dated November 20, 2006).

Ms. Fisk now claims that Project Help–EA is a proper defendant and should not be dismissed. (Fisk 12/17/06 Letter at 3–4). Ms. Fisk at one point requested that Project ORE, a program run by the Educational Alliance, provide her with a psychiatric evaluation so that she could show it to a social worker at the Connecticut Department of Children and Families.[8] (Fisk 12/17/06 Letter at 1). According to Ms. Fisk, she was evaluated by Dr. Heather Lewerenz, the same psychiatrist who later signed Ms. Fisk's emergency involuntary admission forms at Bellevue. (Fisk 12/17/06 Letter at 1). Ms. Fisk contends that Project Help–EA is responsible for Dr. Lewerenz's later evaluation at Bellevue on July 12, 2002, which led to her involuntary commitment. (Fisk 12/17/06 Letter at 3). Since Ms. Fisk has refused to dismiss it from the case, Project Help–EA has now moved for summary judgment.

*Discussion*

A. *Summary Judgment Standard*

Summary judgment is appropriate where the evidence offered demonstrates "that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); *see also Tocker v. Philip Morris Companies, Inc.,* 470 F.3d 481, 486–87 (2d Cir.2006); *Andy Warhol Foundation for the Visual Arts, Inc. v. Federal Insurance Co.,* 189 F.3d 208, 214 (2d Cir.1999). The moving party bears the initial burden of demonstrating "the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). "In moving for summary judgment against a party who will bear the ultimate burden of proof at trial, the movant's burden will be satisfied if he can point to an absence of evidence to support an essential element of the nonmoving party's claim." *Goenaga v. March of Dimes Birth Defects Foundation,* 51 F.3d 14, 18 (2d Cir.1995); *see also Celotex,* 477 U.S. at 325; *Feurtado v. City of New York,* 337 F.Supp.2d 593, 599 (S.D.N.Y.2004). Where the moving party meets that burden, the opposing party must come forward with "specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e). A nomovant opposing summary judgment must "go beyond the pleadings and by [his] own affidavits, or by the 'depositions, answers to interrogatories and admissions on file' designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex,* 477 U.S. at 324 (quoting Fed.R.Civ.P. 56(e)).

In assessing whether the nonmoving party has presented evidence sufficient to raise a genuine issue of material fact, the court resolves all ambiguities and draws all factual inferences in favor of the nonmoving party. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Vann v. City of New York,* 72 F.3d 1040, 1048–49 (2d Cir.1995). "The litigant opposing summary judgment may not rest upon mere conclusory allegations or denials, but must bring forward some affirmative indication that his version of relevant events is not fanciful." *Podell v. Citicorp Diners Club, Inc.,* 112 F.3d 98, 101 (2d Cir.1997) (internal quotations and citations omitted); *see also Matsushita Electric Industrial Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts"); *Goenaga,* 51 F.3d at 18 (nonmovant "may not rely simply on con-

---

8. Ms. Fisk's son is currently in foster care in Connecticut. (Fisk Decl. at 4).

clusory statements or on contentions that the affidavits supporting the motion are not credible").

█ Where, as here, a litigant is *pro se,* her submissions should be read liberally and interpreted "to raise the strongest arguments that they suggest." *McPherson v. Coombe,* 174 F.3d 276, 280 (2d Cir. 1999) (quoting *Burgos v. Hopkins,* 14 F.3d 787, 790 (2d Cir.1994)). Nevertheless, proceeding *pro se* does not relieve a litigant from the usual requirements of summary judgment, and a *pro se* party's " 'bald assertion,' completely unsupported by evidence, is not sufficient to overcome a motion for summary judgment." *Lee v. Coughlin,* 902 F.Supp. 424, 429 (S.D.N.Y. 1995) (quoting *Carey v. Crescenzi,* 923 F.2d 18, 21 (2d Cir.1991)); *accord Gittens v. Garlocks Sealing Technologies,* 19 F.Supp.2d 104, 110 (W.D.N.Y.1998).

### B. *John Doe Defendants*

Counsel for the City defendants represents that documents produced to the plaintiff contained the names of the numerous John Doe defendants. (Memorandum of Law in Support of Municipal Defendants' Motion for Summary Judgment at 4 n. 1). However, Ms. Fisk has not identified these defendants, and has submitted no proof that Dr. John Doe, John Joe, Officer J. Soe, Dr. Koe, and Does 1–30 were ever served with process. There is similarly no proof that Project Help has been served with process. Approximately two and a half years have passed since Ms. Fisk filed her Amended Complaint. Accordingly, all claims against the John Doe defendants and Project Help should be dismissed without prejudice pursuant to Rule 4(m) of the Federal Rules of Civil Procedure. *See Dove v. City of New York,* No. 06 Civ. 1096, 2006 WL 3802267, at *1 n. 1 (S.D.N.Y. Dec. 26, 2006); *Jeanty v. County of Orange,* 379 F.Supp.2d 533, 536 n. 3 (S.D.N.Y.2005); *Malone v. City of*

*New York,* No. CV–05–2882, 2006 WL 2524197, at *3 (E.D.N.Y. Aug. 30, 2006).

### C. *City Defendants*

█ The plaintiff has alleged that the City defendants violated her rights under the First, Fourth, Fifth, Sixth, and Fourteenth Amendments, as well as state law. The Sixth Amendment, by its terms, applies only to criminal proceedings, as do the relevant provisions of the Fifth Amendment. U.S. Const. amend. V, VI. Although the Fifth Amendment privilege against self-incrimination may be asserted in civil proceedings, "a violation of the constitutional *right* against self-incrimination occurs only if one has been compelled to be a witness against himself in a criminal case." *Chavez v. Martinez,* 538 U.S. 760, 770, 123 S.Ct. 1994, 155 L.Ed.2d 984 (2003) (emphasis in original). Because the state court proceedings at issue here were not criminal proceedings, Ms. Fisk's Fifth and Sixth Amendment claims lack merit and must be dismissed. In addition, Ms. Fisk has alleged no facts that would give rise to a claim under the First Amendment. I will address Ms. Fisk's remaining claims against the City defendants below.

#### 1. *Substantive Due Process*

Ms. Fisk contends that the defendants violated her right to substantive due process under the Fourteenth Amendment by involuntarily committing her to Bellevue for over a month and by administering Risperdal over her objections. There is no evidence that either Dr. Ciric or Dr. Castaneda was involved in the decision to admit Ms. Fisk to Bellevue or to keep her there; their involvement appears to have been limited to seeking a court order permitting the hospital to medicate her without her consent. Therefore, I will first address whether Dr. Roman violated the plaintiff's right to due process by detaining her at Bellevue against her will. I will then address whether any of the individual

City defendants violated Ms. Fisk's constitutional rights by medicating her against her will.

### a. *Involuntary Commitment*

 "An involuntary civil commitment is a 'massive curtailment of liberty.' " *Rodriguez v. City of New York*, 72 F.3d 1051, 1061 (2d Cir.1995) (quoting *Vitek v. Jones*, 445 U.S. 480, 491, 100 S.Ct. 1254, 63 L.Ed.2d 552 (1980)). Accordingly, "[a]s a substantive matter, due process does not permit the involuntary hospitalization of a person who is not a danger either to herself or to others." *Id.* (citing *O'Connor v. Donaldson*, 422 U.S. 563, 575, 95 S.Ct. 2486, 45 L.Ed.2d 396 (1975)). "[A] State cannot constitutionally confine . . . a nondangerous individual who is capable of surviving safely in freedom by himself or with the help of willing and responsible family members or friends." *O'Connor*, 422 U.S. at 576.

 The Mental Hygiene Law implicitly defers to medical judgment, and requires physicians "to make a medical decision, guided by standards that are generally accepted within the medical community." *Rodriguez*, 72 F.3d at 1062–63 (quoting *Rodriguez v. City of New York*, 861 F.Supp. 1173, 1181 (S.D.N.Y.1994)).

> Though committing physicians are not expected to be omniscient, the statute implicitly requires that their judgment—affecting whether an individual is to be summarily deprived of her liberty—be exercised on the basis of substantive and procedural criteria that are not substantially below the standards generally accepted in the medical community. Due process requires no less.

*Id.* at 1063.

 "A doctor's decision to commit a person involuntarily . . . does not ordinarily involve matters 'within the layman's realm of knowledge.' " *Olivier v. Robert L. Yeager Mental Health Center*, 398 F.3d

183, 190 (2d Cir.2005) (quoting *Sitts v. United States*, 811 F.2d 736, 740 (2d Cir. 1987)). Whether Dr. Roman's decision to commit Ms. Fisk to Bellevue against her will violated her right to substantive due process " 'turns on the meaning of the facts which [typically] must be interpreted by expert psychiatrists and psychologists.' " *Id.* at 191 (quoting *Addington v. Texas*, 441 U.S. 418, 429, 99 S.Ct. 1804, 60 L.Ed.2d 323 (1979) (alteration in original)); *see also Rodriguez*, 72 F.3d at 1063. The plaintiff bears the burden of producing competent evidence, typically in the form of expert testimony, regarding applicable medical standards and the defendants' alleged failure to meet those standards. *See Drozdik v. City of New York*, No. 01 Civ. 3300, 2003 WL 366639 (S.D.N.Y. Feb. 20, 2003); *see also Olivier*, 398 F.3d at 190–91 (refusing to find in favor of plaintiff absent expert testimony regarding "standards generally accepted in the medical community").

 When Ms. Fisk was admitted to the psychiatric unit, Dr. Roman found that she "suffered from a psychotic disorder that was escalating and eroding her ability to lead a safe life," and that her efforts to form a relationship with Mr. Letterman "were escalating and starting to show signs of dangerousness." (Roman Dep. at 2). He also feared that the plaintiff might herself be harmed if she continued to engage in confrontations with CBS security staff. (Roman Dep. at 2). Dr. Roman's findings were based upon review of the emergency room record, which contained the Project Help reports, Dr. Stockton's assessment of the plaintiff, treatment notes from the emergency room, and the § 9.39 admission form signed by Dr. Lewerenz indicating that the plaintiff's behavior was "aggressive, belligerent, hostile, [and] persistent." (Medical Records, Bates No. 0195; Roman Dep. at 3). At the initial hearing on July 16, 2002, Dr. Roman testified that Ms. Fisk's behavior,

as described in the documents he had reviewed, indicated "a delusional fixation on David Letterman, and historically these situations can become dangerous to the person that is the focus of the fixation." (7/16/02 Tr. at 7). After the hearing, Dr. Roman spoke with CBS security staff, who confirmed that Ms. Fisk had become increasingly aggressive and belligerent and had recently had a confrontation with a police officer. (Roman Dep. at 3).

Ms. Fisk contends that in finding that she was a danger to herself or others, Dr. Roman relied primarily upon false allegations made by CBS security staff. (Fisk Decl. at 12, 16, 19–20). She provides no support for her contention that the statements made by CBS security staff were false, aside from her assertion that Mr. DeLace had a motive to lie because she had threatened to sue him for assault. Even assuming that the information from CBS was not true, however, there is no evidence that Dr. Roman should have known that to be the case. Although Ms. Fisk repeatedly told Dr. Roman that CBS's allegations were false, Dr. Roman found her to be "an unreliable historian" because she made numerous contradictory statements. (Roman Dep. at 3). Other doctors who examined Ms. Fisk also indicated that her stories were inconsistent. (Medical Records, Bates Nos. 0016, 0043). In addition, Dr. Roman noted that Ms. Fisk acknowledged her romantic attachment to Mr. Letterman and her repeated attempts to contact him. (Roman Dep. at 3).

Dr. Roman found that "CBS's motivation to refer Ms. Fisk for psychiatric evaluation in lieu of having her arrested felt genuine, consistently stated and without malice." (Roman Dep. at 3). The CBS e-mails reviewed by Dr. Roman supported this impression, indicating that CBS security had tolerated Ms. Fisk for a number of years and chose to intervene only as a last resort. In one e-mail, for example, Mr. Romaine stated, "We are prepared to effect an arrest, but if this can be handled in a less intrusive but more effective way, we'll give [psychiatric] intervention a try." (Project Help Report, Bates No. 0235). In a July 8, 2002 e-mail, he wrote, "When she sees Letterman's security, she hides. [Manhattan Precinct] is going to arrest her for stalking if she continues to show up. Too bad this has progressed to this point, but we're concerned now because she has actually gotten 'into the faces' of some of my folks over there." (Project Help Report, Bates No. 0229). The fact that CBS security chose to contact DHS twice in an effort to ensure that Ms. Fisk received psychiatric treatment, rather than seeking to have Ms. Fisk arrested, further supports Dr. Roman's conclusion that CBS was not motivated by ill will.

 Ms. Fisk points out that there is no evidence that she "behaved badly" during her confinement at Bellevue. (Fisk Decl. at 20; 7/16/02 Tr. at 6; Medical Records, Bates No. 0006). There is also very little evidence regarding the behavior that led CBS to believe Ms. Fisk dangerous. Dr. Roman himself noted on July 22, 2002 that "[g]iven the gravity of the situation, i.e., patient's right to be not confined [sic] v. potential danger to people in the community, it may be necessary to contact CBS security to get more specific information."[9] (Medical Records, Bates No. 0056). It does not appear that Dr. Roman ever received any more specific informa-

---

9. One judge who reviewed Ms. Fisk's involuntary commitment commented on the fact that there was little evidence to support Dr. Roman's contention that she posed a danger to herself or others. (Transcript of Hearing before Justice Martin B. Schoenfeld on July 30, 2002, at 24) ("The problem that I'm having is that clearly, Ms. Fisk has been brought to this hospital essentially on a bunch of hearsay

tion from CBS. However, due process does not require "a recent overt act" demonstrating dangerousness to oneself or others as a prerequisite for involuntary commitment. *See Rodriguez,* 72 F.3d at 1062 (citing *Project Release,* 722 F.2d at 973–74). Ms. Fisk has presented no evidence that Dr. Roman's determination that she presented a danger to herself or others, which was based upon personal examination of the plaintiff and review of extensive documentation from other physicians, fell below generally accepted medical standards.[10] Accordingly, summary judgment should be granted to the defendants with regard to Ms. Fisk's claim that her involuntary commitment violated her right to substantive due process.

### b. *Involuntary Medication*

Ms. Fisk also alleges that Dr. Roman, Dr. Ciric, and Dr. Castaneda violated her substantive due process rights when they sought and obtained a court order permitting the involuntary administration of Risperdal.[11]

At the hearing held to determine whether Ms. Fisk should be forcibly medicated, Dr. Roman testified that Ms. Fisk was dangerous because she had exhibited an "escalating pattern of behavior" that reflected "psychotic decompensation over

time." (7/24/02 Tr. at 20). According to Dr. Roman, such "[s]talking behavior frequently leads to violence." (7/24/02 Tr. at 21). Dr. Roman and Dr. Ciric stated in their affirmations in support of the petition that Ms. Fisk's illness interfered "with her ability to make reasoned decisions with respect to her treatment." (Roman Aff., ¶ 11; Ciric Aff., ¶ 11). The court ultimately agreed that Ms. Fisk lacked "the capacity to make a reasoned decision with respect to her treatment" and that treatment with anti-psychotic medication was in her best interest. (Medical Records, Bates No. 0189).

 An involuntarily committed patient has a "liberty interest in avoiding the unwanted administration of antipsychotic drugs. The right to refuse medication, however, is not absolute, and may be outweighed by competing state interests." *Graves v. MidHudson,* No. CV–04–3957, 2006 WL 3103293, at *3–4 (E.D.N.Y. Nov.2, 2006) (citing *Washington v. Harper,* 494 U.S. 210, 220–21, 110 S.Ct. 1028, 108 L.Ed.2d 178 (1990)). Neither the Second Circuit nor the Supreme Court has "identified the circumstances under which the State may administer psychotropic drugs against the will of an involuntarily committed patient without violating substantive due process." [12] *Id.* at *4.

---

statements and I haven't seen anybody from CBS coming in to testify."). The judge nevertheless accepted Dr. Roman's medical opinion regarding the need to keep Ms. Fisk in the hospital against her will.

10. On March 15, 2007, because the plaintiff had not submitted any evidence on this issue, and because she is proceeding *pro se,* I issued a six-week stay of the defendants' motions in order to give her time to submit an affidavit from a qualified psychiatric expert. (Memorandum and Order dated March 15, 2007 at 2). On May 21, 2007, Ms. Fisk informed the Court that she was unable to obtain an expert affidavit and requested that the Court accept an affidavit from the plaintiff "regarding the

legality and ethicality of the actions of the defendants." (Motion to Accept the Affidavit of Plaintiff in Lieu of the Affidavit of an Expert Witness). I denied that application because, as noted above, it is the plaintiff's burden to support her claim with expert evidence. *See Drozdik,* 2003 WL 366639, at *5.

11. The court order permitted the administration of other drugs as well. However, Ms. Fisk does not allege that any drugs other than Risperdal were administered pursuant to the order.

12. In *Graves,* the court found that the standards established by the Supreme Court in *Harper* for the forcible medication of prison inmates should also apply to persons who are

The Second Circuit has stated, however, that "a doctor will not be liable under § 1983 for the treatment decisions she makes unless such decisions are 'such a substantial departure from accepted judgment, practice, or standards as to demonstrate that [she] actually did not base the decision on such a judgment.'" *Kulak v. City of New York*, 88 F.3d 63, 75 (2d Cir.1996) (quoting *Youngberg v. Romeo*, 457 U.S. 307, 323, 102 S.Ct. 2452, 73 L.Ed.2d 28 (1982) (alteration in original)); *accord White v. Napoleon*, 897 F.2d 103, 112 (3d Cir.1990) ("[A]uthorities may administer anti-psychotic drugs to an unwilling patient only where the decision is a product of the authorities' professional judgment. A decision of the institution's staff is presumed valid unless it is shown to be a substantial departure from accepted professional judgment, practice or standards." (internal citations and quotation marks omitted)). Ms. Fisk has offered no evidence to support a claim that the defendants' decision to medicate her against her will deviated from accepted medical standards.

In any case, the defendants are entitled to qualified immunity on this claim. Under the doctrine of qualified immunity, "[g]overnment actors performing discretionary functions are 'shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Lennon v. Miller*, 66 F.3d 416, 420 (2d Cir.1995) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 817–18, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982)). "For a constitutional right to be clearly established, there must

be binding precedent recognizing it[.]" *Graves*, 2006 WL 3103293, at *5 (citing *Moore v. Vega*, 371 F.3d 110, 114 (2d Cir. 2004)). In this case, because "neither the Supreme Court nor the Second Circuit has defined the circumstances under which forcible medication of an involuntarily committed patient is prohibited," *Graves*, 2006 WL 3103293, at * 6, Dr. Roman, Dr. Ciric, and Dr. Castaneda are entitled to qualified immunity.

Accordingly, summary judgment should be granted to the defendants on Ms. Fisk's claim that the decision to administer Risperdal without her consent violated her right to substantive due process.

### 2. *Procedural Due Process*

"Civil commitment for any purpose requires due process protection." *Project Release*, 722 F.2d at 971. "[D]ue process does not permit continuation of a challenged involuntary civil commitment without a hearing, at which the substantive predicates must be established by clear and convincing evidence." *Rodriguez*, 72 F.3d at 1062 (citing *Addington v. Texas*, 441 U.S. 418, 423–31, 99 S.Ct. 1804, 60 L.Ed.2d 323 (1979)). As noted above, the Second Circuit has held that New York's Mental Hygiene Law meets the requirements of procedural due process. *Project Release*, 722 F.2d at 971.

Each of the relevant provisions of the Mental Hygiene Law was followed in this case. On July 11, 2002, Ms. Fisk was transported to Bellevue by Dr. Stockton, a Director of Community Services, pursuant to MHL § 9.37. Within seventy-two hours, she was evaluated by two staff physicians

---

involuntarily committed. 2006 WL 3103293, at *4; *see also Jurasek v. Utah State Hospital*, 158 F.3d 506, 510–11 (10th Cir.1998). Accordingly, the court held that "the State may only administer psychotropic drugs over the objection of an involuntarily committed pa-

tient if (1) the patient is incompetent to make medical decisions, (2) the patient is dangerous to himself or others, and (3) the treatment is in the patient's medical interest." *Graves*, 2006 WL 3103293, at *4.

(Dr. Lewerenz and Dr. Bensimhon), who found that she should be admitted involuntarily on an emergency basis under MHL § 9.39. She was given notice of her right to appeal that decision. A hearing was held within five days of Ms. Fisk's admission to Bellevue, on July 16, 2002, at which she was represented by counsel and was permitted to testify on her own behalf. As explained above, in order for a hospital to retain an involuntarily committed patient, two examining physicians must certify that the patient continues to be in need of involuntary treatment. On July 29, 2002, as required by MHL § 9.27, Dr. Roman, Dr. Geller, and Dr. Freeman certified that Ms. Fisk was in need of involuntary care and posed a danger to herself or others. The plaintiff requested a hearing, which was held the following day. The court denied her request for immediate release, but ordered that she be released no later than September 10, 2002. On August 20, 2002, Ms. Fisk requested and was granted another hearing in order to challenge her commitment. She was released three days later. The plaintiff appears to have been afforded each of the procedural protections built into the Mental Hygiene Law. Accordingly, her involuntary commitment did not violate her right to procedural due process.

■ With respect to the court order permitting involuntary administration of Risperdal, the Second Circuit has held that "due process requires an opportunity for hearing and review of a decision to administer antipsychotic medication—but such a hearing need not be judicial in nature." *Project Release*, 722 F.2d at 981. Here, Ms. Fisk was afforded a judicial hearing, at which she testified and was represented by counsel. Accordingly, there was no procedural due process violation. Summary judgment should therefore be granted to the defendants on Ms. Fisk's procedural due process claims.

### 3. *Fourth Amendment*

■ Ms. Fisk's involuntary commitment at Bellevue constituted a seizure within the meaning of the Fourth Amendment, which protects against unreasonable searches and seizures.[13] *See Glass v. Mayas*, 984 F.2d 55, 58 (2d Cir.1993); *Drozdik*, 2003 WL 366639, at *4. An involuntary hospitalization does not violate the Fourth Amendment if it is based upon probable cause, meaning that " 'there are reasonable grounds for believing that the person seized' is dangerous to herself or to others." *Anthony v. City of New York*, 339 F.3d 129, 137 (2d Cir.2003) (quoting *Glass*, 984 F.2d at 58); *accord Drozdik*, 2003 WL 366639, at *5. "The Fourth Amendment requires a 'probability or substantial chance of dangerous behavior, not an actual showing of such behavior.' " *Waananen v. Barry*, 343 F.Supp.2d 161, 170 (D.Conn. 2004) (quoting *Vallen v. Connelly*, No. 99 Civ. 9947, 2004 WL 555698, at *8 (S.D.N.Y. March 19, 2004)). Ms. Fisk's Fourth Amendment claim applies only to Dr. Roman, since none of the other individual defendants were involved in the decision to keep Ms. Fisk in the hospital against her will.

■ As described above, during the course of Ms. Fisk's time at Bellevue, a state court concluded on three separate occasions that Ms. Fisk was subject to involuntary hospitalization under the governing legal standard. The court made its

---

**13.** Ms. Fisk's transportation to Bellevue by Project Help against her will also constituted a seizure for Fourth Amendment purposes. However, as noted above, all claims against the Project Help defendants, none of whom have been served with process, must be dismissed. Consequently, there is no need to analyze whether their actions violated the Fourth Amendment.

determination on the basis of the same facts upon which Dr. Roman relied: Ms. Fisk's statements and behavior, as described by CBS security staff and the Project Help team and as observed by medical staff at the hospital. Since the state court agreed with Dr. Roman's determination that Ms. Fisk posed a danger to others, Ms. Fisk cannot now maintain a claim that Dr. Roman lacked probable cause to detain her. *Cf. Drozdik,* 2003 WL 366639, at *5 (finding probable cause for involuntary commitment where doctors made "medical judgment[ ] that [plaintiff] posed [ ] a danger"). As a result, the plaintiff's Fourth Amendment claim must also be dismissed.

#### 4. *Equal Protection*

■ Ms. Fisk also claims that the defendants violated her right to equal protection under the Fourteenth Amendment. Although Ms. Fisk has alleged that she wears a Star of David symbolizing her Jewish faith (Am.Compl., ¶ 2), she has not alleged any facts that would permit an inference that the defendants discriminated against her on the basis of her religion. Nor has Ms. Fisk alleged any facts that would support a "class of one" equal protection claim. *See Village of Willowbrook v. Olech,* 528 U.S. 562, 564, 120 S.Ct. 1073, 145 L.Ed.2d 1060 (2000) (recognizing "class of one" claim where plaintiff alleges she has been intentionally treated differently from others similarly situated and that there is no rational basis for difference in treatment); *see also Clubside, Inc. v. Valentin,* 468 F.3d 144, 159 (2d Cir.2006) (noting that "class of one" plaintiffs must show "an extremely high degree of similarity between themselves and the persons to whom they compare themselves"). Her equal protection claim should therefore be dismissed.

#### 5. *Municipal Liability*

■ It appears that the plaintiff seeks to hold the City liable under § 1983 solely on the basis of the actions of the individual defendants. However, local governments cannot be held liable for the acts of their employees under the doctrine of *respondeat superior. Monell v. Department of Social Services of the City of New York,* 436 U.S. 658, 690–95, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). Accordingly, "a single incident of unconstitutional conduct by a non-policymaking employee" of the City will generally not suffice to establish liability. *Warheit v. City of New York,* No. 02 Civ. 7345, 2006 WL 2381871, at *12 (S.D.N.Y. Aug.15, 2006) (citing *Davis v. City of New York,* 228 F.Supp.2d 327, 336 (S.D.N.Y.2002)). Instead, municipalities may only be liable under § 1983 if their violation of the plaintiff's federal rights resulted from an official policy, custom, or practice of the municipal body. *Monell,* 436 U.S. at 694; *City of St. Louis v. Praprotnik,* 485 U.S. 112, 121–22, 108 S.Ct. 915, 99 L.Ed.2d 107 (1988).

■ Even where a plaintiff alleges that her injuries were caused by a municipal policy, custom, or practice, the municipality cannot be held liable if the constitutional claim is based solely upon the actions of a named individual defendant who is found not liable. *Santana v. City of Hartford,* 283 F.Supp.2d 720, 728–29 (D.Conn.2003) (citing *City of Los Angeles v. Heller,* 475 U.S. 796, 798–99, 106 S.Ct. 1571, 89 L.Ed.2d 806 (1986)); *see also Curley v. Village of Suffern,* 268 F.3d 65, 71 (2d Cir.2001) (holding that municipality cannot be liable for inadequate training or supervision where officers involved in making arrest did not violate plaintiff's constitutional rights). Of course, "[m]unicipal liability for constitutional injuries may be found to exist even in the absence of individual liability when 'the injuries complained of are not solely attributable to the actions of the named defendants,' but this is not such a case." *Santana,*

283 F.Supp.2d at 729 (quoting *Barrett v. Orange County Human Rights Commission*, 194 F.3d 341, 350 (2d Cir.1999)). Because Ms. Fisk has not produced sufficient evidence to withstand summary judgment with respect to her constitutional claims against the individual defendants, she also cannot maintain her claims against the City of New York.

As noted above, the defendants are entitled to qualified immunity with respect to Ms. Fisk's claim that the decision to administer Risperdal against her will violated her right to substantive due process. Because "the municipality enjoys no qualified immunity shield," municipal liability is not barred when individual defendants are found not liable on the basis of qualified immunity. *Curley*, 268 F.3d at 71–72. However, the City cannot be held liable for the decision to medicate the plaintiff involuntarily because she has not produced any evidence to support a claim that the decision was the result of an official policy, custom, or practice. Accordingly, the City of New York is entitled to summary judgment on each of Ms. Fisk's claims.

### 6. *State Law Claims*

In addition to her § 1983 claims, Ms. Fisk has asserted a number of state tort claims against the City defendants, including intentional infliction of emotional distress, negligent infliction of emotional distress, and false imprisonment. When all federal claims are dismissed, district courts should generally decline to exercise supplemental jurisdiction over pendent state law claims. *See Warheit*, 2006 WL 2381871, at *13 (declining to exercise supplemental jurisdiction over plaintiff's state law claims after dismissing federal constitutional claims involving involuntary commitment); *Drozdik*, 2003 WL 366639, at *6 (same); *see also In re Merrill Lynch Limited Partnerships Liti-*gation, 154 F.3d 56, 61 (2d Cir.1998) (per curiam) (finding that district courts should decline to exercise supplemental jurisdiction over state law claims when all federal claims have been dismissed). Accordingly, the plaintiff's state law claims should be dismissed without prejudice to renewal in the appropriate state court.

### D. *Project Help–EA*

As explained above, Ms. Fisk alleges that Project Help–EA is a proper defendant because Dr. Lewerenz, an attending psychiatrist at Bellevue who signed the § 9.39 admission form, also examined the plaintiff several months earlier on behalf of Project ORE, a program run by the Educational Alliance. That examination indicated that Ms. Fisk did not suffer from a mental illness, although it indicated that she suffered "multiple severe stressors," including homelessness and loss of custody of her children. (Psychiatric Summary dated Feb. 5, 2002 ("Psych.Summary"), attached as Exh. D to Crumpley Aff.). When Dr. Lewerenz evaluated Ms. Fisk at Bellevue, by contrast, she found that the plaintiff was mentally ill and a danger to herself and others. (Medical Records, Bates Nos. 0194–0195). Ms. Fisk contends that Dr. Lewerenz "had a duty to fairly and objectively evaluate Plaintiff's mental state at Bellevue but, instead, caved in to pressure from CBS ... and [the] State of Connecticut." (Fisk 12/17/06 Letter at 3). Ms. Fisk further contends that the Educational Alliance is somehow responsible for Dr. Lewerenz's allegedly wrongful conduct. (Fisk 12/17/06 Letter at 3).

Dr. Lewerenz was not an employee of the Educational Alliance when she examined the plaintiff in February 2002. (Crumpley Aff., ¶ 5). Rather, she was affiliated with the Project for Psychiatric Outreach for the Homeless ("PPOH"), an

unrelated non-profit agency made up of psychiatrists who donate their services to the homeless. The psychiatric evaluation written by Dr. Lewerenz on February 5, 2002 indicates that Ms. Fisk "was referred for evaluation through [PPOH]." (Psych.Summary). Even if one assumes that Project ORE (and therefore the Educational Alliance) was responsible for Dr. Lewerenz's initial evaluation of the plaintiff, however, it does not follow that the Educational Alliance was responsible for Dr. Lewerenz's second evaluation, which led to the plaintiff's involuntary commitment. Dr. Lewerenz recommended emergency involuntary admission in her capacity as an attending physician at Bellevue. Ms. Fisk has provided no evidence that the Educational Alliance had anything to do with Dr. Lewerenz's evaluation of Ms. Fisk at Bellevue on January 12, 2002. Accordingly, Project Help–EA's motion for summary judgment must be granted.

*Conclusion*

For the reasons stated above, the City defendants' motion should be granted, and all claims against Dr. Steven Ciric, Dr. Ricardo Castaneda, Dr. William Roman, the City of New York, and Project Help–EA should be dismissed. In addition, all claims against defendants Dr. John Doe, John Joe, Officer J. Soe, Dr. Koe, Does 1–30, and Project Help should be dismissed pursuant to Rule 4(m) for failure to effect service. Pursuant to 28 U.S.C. § 636(b)(1) and Rules 72, 6(a), and 6(e) of the Federal Rules of Civil Procedure, the parties shall have ten (10) days from this date to file written objections to this Report and Recommendation. Such objections shall be filed with the Clerk of the Court, with extra copies delivered to the chambers of the Honorable Victor Marrero, U.S.D.J., Room 414, 500 Pearl Street, New York,

New York 10007. Failure to file timely objections will preclude appellate review.

### *DECISION AND ORDER*

MARRERO, District Judge.

### I. BACKGROUND

By Decision and Order dated July 17, 2007 (the "Order")[1], the Court, adopting the recommendation of Magistrate Judge James C. Francis dated June 6, 2007, granted the motion of defendants Ricardo Castaneda, Steven Ciric, William Roman, Project HELP and the City of New York (collectively "Defendants") for summary judgment pursuant to Federal Rule of Civil Procedure 56, and directed that the complaint of plaintiff Shirley Ann Fisk ("Fisk") filed in this case be dismissed. The Court determined that Fisk had failed to establish that her involuntary commitment by Defendants violated any of the constitutional or common law rights invoked by Fisk in this action.

Fisk now moves for an order granting reconsideration pursuant to Local Civil Rule 6.3. For the reasons stated below, Fisk's motion is DENIED.

### II. STANDARD OF REVIEW

Reconsideration of a previous order by the court is an "extraordinary remedy to be employed sparingly in the interests of finality and conservation of scarce judicial resources." *In re Health Mgmt. Sys. Inc. Sec. Litg.*, 113 F.Supp.2d 613, 614 (S.D.N.Y.2000) (citations and quotation omitted). "The provision for reargument is not designed to allow wasteful repetition of arguments already briefed, considered and decided." *Schonberger v. Serchuk*, 742 F.Supp. 108, 119 (S.D.N.Y.

---

1. The Decision and Order is reported as *Fisk v. Letterman*, No. 04 Civ. 6972, 501 F.Supp.2d 505 (S.D.N.Y. July 17, 2007).

1990). "The major grounds justifying reconsideration are 'an intervening change in controlling law, the availability of new evidence, or the need to correct a clear error or prevent manifest injustice.'" *Virgin Atlantic Airways, Ltd. v. National Mediation Bd.*, 956 F.2d 1245, 1255 (2d Cir.1992) (*quoting* 18B C. Wright, A. Miller & E. Cooper, *Federal Practice & Procedure* § 4478 at 790). To these ends, a request for reconsideration under Local Rule 6.3 must demonstrate controlling law or factual matters put before the court in its decision on the underlying matter that the movant believes the court overlooked and that might reasonably be expected to alter the conclusion reached by the court. *See Shrader v. CSX Transp., Inc.*, 70 F.3d 255, 257 (2d Cir.1995).

 Local Rule 6.3 is intended to "'ensure the finality of decisions and to prevent the practice of a losing party ... plugging the gaps of a lost motion with additional matters.'" *S.E.C. v. Ashbury Capital Partners*, No. 00 Civ. 7898, 2001 WL 604044, at *1 (S.D.N.Y. May 31, 2001) (*quoting Carolco Pictures, Inc. v. Sirota*, 700 F.Supp. 169, 170 (S.D.N.Y.1988)). A court must narrowly construe and strictly apply Local Rule 6.3 so as to avoid duplicative rulings on previously considered issues and to prevent the Rule from being used to advance different theories not previously argued, or as a substitute for appealing a final judgment. *See Montanile v. Nat'l Broadcasting Co.*, 216 F.Supp.2d 341, 342 (S.D.N.Y.2002); *Shamis v. Ambassador Factors Corp.*, 187 F.R.D. 148, 151 (S.D.N.Y.1999).

### III. *DISCUSSION*

 Fisk's submission in support of the instant motion urges reconsideration essentially on the basis of the same arguments she raised in opposing the underlying motion for summary judgment, points that this Court already fully considered and found meritless. The instant motion cites no controlling law or factual matters the Court overlooked that might reasonably be expected to alter the outcome of the Order. Specifically, Fisk repeats her version of the facts and the evidence on record that was presented before Magistrate Judge Francis and to this Court in response to Defendants' motion. As stressed by the Court in the Order, Fisk's objections to the granting of summary judgment consisted of "a lengthy recitation of the facts stated in generalizations, conjectures, and conclusory terms." *Fisk*, 501 F.Supp.2d at 512. Her request for reconsideration presents nothing that the Court has not already taken into account.

Because Fisk has failed to identify any controlling law or factual matters put to the Court on the underlying motion that the Court demonstrably failed to take into account, Fisk's motion for reconsideration is DENIED.

### IV. *ORDER*

For the reasons stated above, it is hereby **ORDERED** that motion of plaintiff Shirley Ann Fisk for reconsideration (Docket No. 162) of the Court's Decision and Order dated July 17, 2007 is DENIED.

**SO ORDERED.**